966 A.2d 93

JOYCE BARBER AND MICHAEL JAMES BARBER, HER HUS-
BAND, PLAINTIFFS–RESPONDENTS, v. SHOPRITE OF EN-
GLEWOOD & ASSOCIATES, INC., T/A SHOPRITE OF WHAR-
TON, NEW JERSEY STORE NUMBER 487, DEFENDANT–
APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 28, 2008—Decided March 19, 2009.

34

Before Judges WEFING, PARKER and LeWINN.

*Robert F. Gold* argued the cause for appellant (*Gold, Albanese & Barletti,* attorneys; *Mr. Gold,* of counsel; *Mr. Gold, James N. Barletti* and *Christian Bruun,* on the briefs).

*Brian P. Fleming* argued the cause for respondents (*Brunnock & Fleming,* attorneys; *Mr. Fleming,* on the brief).

The opinion of the court was delivered by

PARKER, J.A.D.

Defendant ShopRite of Englewood & Associates, Inc. (ShopRite) appeals from an order entered on August 4, 2006 denying defendant's motion for judgment notwithstanding the verdict (JNOV), or alternatively, for a new trial. The verdict had been rendered by a jury on June 16, 2006, finding defendant negligent and awarding plaintiff $876,000 in damages. After considering defendant's arguments and reviewing the entire record in this matter, including the post-judgment hearing to determine if there was juror misconduct, we reverse and remand for a new trial.

I

On August 15, 2006, defendant filed its initial notice of appeal from the trial court's order of August 4, 2006. On December 13, 2006, defendant moved before us to supplement the trial record on the basis of an article that appeared in the New Jersey Law Journal (Law Journal) on December 4, 2006. The article was authored by Robert Martin, who served as juror number one and foreperson during the trial. During voir dire, Martin disclosed that he was a New Jersey State Senator, a full-time professor of law and a practicing lawyer. We granted defendant's motion to supplement the record and remanded the matter to the trial court to conduct a hearing and take testimony from Martin and the other jurors with respect to Martin's article.

On January 30, 2007, defendant again moved before us for summary disposition, to supplement the record, and for a temporary remand with instructions to the trial court. This application sought to include in the trial record various newspaper statements attributable to Martin and requested that we vacate the July 18, 2006 judgment based upon inconsistencies between Martin's Law Journal article and his subsequent statements. On February 27,

2007, we denied those applications and instructed the trial court to establish the scope and procedure for the remand hearing.

Prior to the start of the remand hearing, the trial court ordered that the hearing be closed to the press and the public. Counsel on behalf of the media moved to intervene to gain access to the hearing. When the trial court denied that application, the media filed an emergent application with us. After hearing argument, we rendered a decision on May 30, 2007 reversing the trial court and ordering that the hearing be conducted in an open forum with the media exercising its constitutional right to report on it. *Barber v. Shop–Rite of Englewood & Assocs., Inc.*, 393 *N.J.Super.* 292, 923 *A.2d* 286 (App.Div.2007).

The remand hearing was conducted in July 2007, and the trial court rendered a written decision wherein it concluded that there was "no credible evidence of misconduct of any kind." Defendant then moved before us to file a supplemental brief addressing the remand issue. That motion was granted.

In this appeal, defendant argues: (1) juror misconduct and impropriety mandates vacating the verdict; (2) defendant was denied a fair trial because of plaintiff's counsel's "antics" and the court's lack of response thereto; (3) plaintiff failed to prove that a dangerous condition existed and that defendant had notice of such condition; (4) the verdict constitutes a miscarriage of justice; and (5) the trial court erred in denying defendant's JNOV motion by misapplying the law.

## II

The underlying facts relevant to this appeal are as follows. On September 15, 2002, plaintiff Joyce Barber [1] was injured when she slipped and fell while looking for pantyhose in aisle five of a supermarket owned by defendant. Plaintiff testified that she did

---

[1] Plaintiff Michael James Barber is a party to this action based on his per quod claim. References to plaintiff in the singular are to Joyce Barber.

not see anything on the floor before or after she fell, but she noticed that the bottom of her pants were wet after the fall. In her complaint, plaintiff alleged that defendant was negligent in failing to maintain or inspect the premises. The matter proceeded to trial in June 2006.

Plaintiff's counsel began his opening statement by informing the jury that "[w]hen a supermarket fails to properly inspect its shopping aisles and as a result, a shopper is seriously injured, the supermarket is responsible for the harm." Plaintiff's counsel then proceeded to tell the jury plaintiff's "story of what happened in the case."

Defense counsel objected to statements made by plaintiff's counsel in his opening statement. Each time defendant objected, the trial court instructed plaintiff to "move on" and advised defendant that the objections would be heard later.

Defendant first objected to plaintiff's counsel's statements concerning defendant's alleged failure to keep or produce records of its spill inspections. Plaintiff's counsel stated:

> [Defendant doesn't] keep any records of when these inspections were done. [Defendant's managers are] relying on their own recollection. . . . [N]either of them can tell us when the last time was that anybody inspected aisle five because there's no records.
>
> Now, the records would have shown us when the inspection was last done, when this walk-through was last done or even whether it had been done at all that day.
>
> We've asked for those records[.]

Plaintiff's counsel further informed the jury that he asked for all of defendant's maintenance records but did not receive the requested materials, implying that defendant withheld records from plaintiff.

Defendant next objected when plaintiff's counsel began telling the jury that plaintiff lost her medical benefits and had to borrow money from her sister to pay for pain management treatment. The court told plaintiff's counsel to "[m]ove on without getting into that." Plaintiff's counsel concluded his opening by stating, "[Y]ou're going to see why the evidence will force me to come back

and ask that you return a *substantial* verdict on [plaintiff's] behalf." (Emphasis added).

Defendant then moved for a mistrial based upon plaintiff's "inflammatory opening statement." Defendant argued that plaintiff improperly framed the opening to suggest that defendant failed to keep records it was obligated to keep and failed to provide them to plaintiff, implying that defendant either "got rid of them" or somehow destroyed "some kind of evidence." Defendant further argued that because plaintiff offered no industry standards on such record keeping, plaintiff's counsel violated the principles of *Amaru v. Stratton,* 209 *N.J.Super.* 1, 15–16, 506 *A.2d* 1225 (App.Div.1985) (holding that where a party's opening statement is clearly prejudicial to the opposing party, a motion for a mistrial should be granted).

Defendant also argued that plaintiff misstated the law by suggesting to the jury that defendant had the burden of demonstrating how long something may or may not have been on the floor. Plaintiff implied, moreover, that it was defendant's burden of proof to identify the substance that allegedly caused plaintiff's fall. Defendant further argued that by asking for "a substantial verdict," plaintiff improperly quantified or suggested to the jury the type of verdict they were to return in violation of *Botta v. Brunner,* 26 *N.J.* 82, 103, 138 *A.2d* 713 (1958) (holding that suggestions by counsel as to the amount of damages to be awarded "constitute an unwarranted intrusion into the domain of the jury").

The trial court initially remarked that plaintiff's comment about a "substantial verdict" was "getting close to the line." With respect to the records plaintiff claimed had not been produced, the trial court indicated it did not have sufficient information to determine whether a discovery violation had occurred. After reviewing the *Botta* case, the court denied the mistrial motion, but admonished plaintiff that the "substantial verdict" comment was improper and should not have been made. When the jurors returned the following day, the court gave a curative instruction:

[T]here are two things that I want to briefly comment on that were raised out of your presence yesterday. And these dealt with comments that were made by the plaintiff's attorney in his opening statement.

Number one, it will be up to you, as it's always up to you, to recall what was said during the course of the trial, but whether it was explicit or implicit, I want to indicate that the burden of proof in this case is on the plaintiff to prove, first of all, that there was a substance on the floor and, secondly, that the defendant knew or should have known about the existence of that substance on the floor before the defendant can be held responsible in this case. That is the law and that is the law that ultimately I will instruct you . . . to follow.

To the extent that plaintiff's counsel, in his opening statement, indicated that the defendant had some burden of proof to prove that there was something on the floor, how long it had been there, or what the substance was is not the law in New Jersey.

. . . .

Secondly, there was a comment towards the end of the plaintiff['s] counsel's opening statement to you in which he asked the jury to return a substantial verdict. The word "substantial" is not a proper comment and I'm instructing you to ignore it. It will be the job of the jury to determine, first of all, if any damages at all are warranted in this case, and that will only occur if you find that the defendant is responsible for the happening of the accident and that the plaintiff's comparative negligence is fifty percent or less in terms of its contributions [to] the happening of the accident.

. . . .

And then your job is to exercise your sound judgment as to what is fair, just and reasonable under all the circumstances. And it's impermissible for counsel to suggest that a substantial award should be returned or that any award should be returned other than a fair and just and reasonable award under the circumstances.

Plaintiff began her case by showing a videotape of her lying on the floor after her fall. There was no testimony about the videotape and the only information provided to the jury about the tape was a brief reference to it in plaintiff's opening statement and then in summation when plaintiff's counsel stated:

We played this videotape.

. . . .

You have the tape. Please feel free to look at it and tell me—just ask yourselves whether that's credible.

. . . .

I know there's a videotape of aisle five and I've been back to where the video is kept, in that back room. . . . I know that's where all the tapes are kept and that's where all the different locations in the store are filmed. I can go back there and I can look at the videotape. It'll probably even show me when she actually fell. I'll be able to see what—how she fell, where her legs went, if her legs really did slip

out from underneath her. And I could look at this, even if I go back a little further, I can probably even see who was the last one to do an inspection. And I'll look at all this before anybody has a chance to erase that tape. No. No, I'm not going to do that. Credibility. It's a key in this case.

As plaintiff's case progressed, she called Russell Tyndall, a ShopRite field merchandiser responsible for inspecting a group of ShopRite stores, including the store in which plaintiff fell. He testified that he was at the store on the day of the accident. When questioned as to the store's inspection procedures, Tyndall testified that field merchandisers and store managers conduct walk-through inspections at the store five times a day. He had no reason to believe that the inspections were not done on the day plaintiff fell.

Plaintiff's counsel asked Tyndall whether the store maintained records of leaks or spills. When Tyndall said it did not, plaintiff's counsel produced a Wakefern corporate form and, without any foundation, asked Tyndall what it was. Tyndall said he did not recognize the form. Defense counsel objected. The court did not rule on the objection, but asked Tyndall if there was any record of the inspection of the store at the start of the day. Tyndall responded that a spiral-bound book was "used every morning to identify problems, issues, call-outs, what happened overnight, aisle by aisle, what was necessary, issues that needed immediate resolve, issues that could wait a few hours, things that could be on the work docket for later on in the day." When Tyndall restated that the Wakefern form was not in use, the court said, "Okay. That's the end of that." At no time did the court instruct the jury to disregard plaintiff's references to the Wakefern form.

Tyndall explained that aisle five was in the health and beauty aids section, but he could not recall exactly what products were contained in that aisle because there were two aisles of health and beauty products. At that point, plaintiff's counsel asked if there were "clear baby splash colognes in that aisle." Tyndall responded: "I can't say that." Plaintiff's counsel then pulled a bottle out of his briefcase and defense counsel objected. After an unrecorded sidebar conference, the court allowed plaintiff to proceed:

Q. Mr. Tyndall, I'm going to show you what's PMB Splash Cologne. It's baby cologne. Can you take a look at this?

A. (Witness reviews product.)

Q. Can you tell me whether that was across the aisle from the pantyhose back in September 15th of '02?

A. No, I cannot.

Q. You don't know?

A. I do not know.

Q. Okay.

A. I don't know if the product was handled back in 2002.

Q. Okay. All right. Do you know if across the aisle from pantyhose there was baby shampoos and baby oils across the aisle from [where] the pantyhose were?

A. No, I don't.

Q. You don't recall that?

A. No.

Tyndall further testified that after plaintiff fell, the only liquid on the floor was "a few drops [of water] from the umbrella" plaintiff had placed in the shopping cart. The drops of water were spread out in an area approximately one foot in circumference by the shopping cart. The cart was a distance from plaintiff when she fell, however. The store manager also testified in her deposition that she did not see any water on the floor where plaintiff fell.

During summation, plaintiff's counsel characterized Tyndall's testimony as follows:

If there was something there, we didn't know about it. And this came from their water—I'm sorry, from their umbrella. It was water from their umbrella. As I said before, we know that Mr. [Tyndall] says that water dissipates. And we know that the umbrella was—I'm sorry, the cart was nowhere near where [plaintiff] fell because she said she walked—the cart was down here. She walked back and she fell right over here.

He then stated:

Now, it happened to be where the baby bath and shampoo, the baby splash cologne. I don't know what it was. She does not know what it was.

Defense counsel again objected to plaintiff's counsel's reference to baby splash cologne without any foundation, and asked to be heard. The court said, "No," and told plaintiff's counsel to continue. Shortly thereafter, plaintiff's counsel—as he did in his opening statement—again referenced inspection records, stating they

"don't exist. Maybe they don't. Maybe a big store like this doesn't have records."

Further on in his summation, plaintiff's counsel referred to the videotape of plaintiff lying on the floor as we have quoted previously. Plaintiff's counsel implied that defendant would destroy the tape when he stated, "I'll look at all this before anybody has a chance to erase that tape. No. No, I'm not going to do that. Credibility. It's a key in this case."

In referring to the jury charge on damages, plaintiff's counsel told the jury: "The judge will not ask you to be concerned with whether or not this could be considered a *windfall* for [plaintiff] because that has nothing to do with the purpose of the law." (Emphasis added). At the conclusion of the summations and the charge to the jury, defense counsel raised a number of objections, including one to plaintiff's counsel's reference to defense expert James Aragona, M.D., having been paid for testifying. Defense counsel noted that there was no evidence about any of the experts having been paid. The court overruled the objection, stating it didn't think the comment was "that unfair."

Defense counsel again objected to plaintiff's counsel commenting on spill inspection records, as he did in the opening statement. Defense counsel again advised the court that because no such records were kept and there was no evidence that records had been withheld, it was unfair for plaintiff's counsel to imply that the documents may have existed but that defendant failed to produce them. The court declined to address the objection.

With respect to the Wakefern form, which plaintiff's counsel showed to Tyndall, the court commented that it "wasn't relevant to this case in this situation," but overruled the objection. Defense counsel then objected to plaintiff's counsel's "windfall" comment as "inappropriate, should never have been made[.]" The court responded, "You're being too sensitive."

After the verdict, defendant moved for JNOV or, alternatively, for a new trial on the issues of liability and damages. Defendant

argued that plaintiff failed to establish that defendant had notice of any condition at the time plaintiff fell or that the condition existed for a sufficient period of time such that it should have been discovered by defendant's personnel. In denying the motion, the court commented that "the amount of the verdict was surprising," but nevertheless

the jury was charged on the necessity of notice to the defendant before the defendant could be liable for a transient substance ... on the floor .... [and] the jury reasonably could have concluded that the defense witnesses whose testimony were part of the plaintiff's case [in] chief contradicted each other on the store's inspection procedure, or at best were unclear as to the walk-through procedure at the store. Moreover, no written policy with respect to an inspection or any inspection records were produced.

## III

On December 4, 2006, while this matter was pending appeal, the Law Journal published an article written by Martin reflecting on his experience as foreperson of the jury. In the article, Martin made the following comments:

My selection as an actual juror certainly came as a surprise. I had assumed—because I was a state senator, law professor, practicing attorney and father of a local lawyer—that the judge or at least one of the trial lawyers would seek my removal. Presumably, either of the trial lawyers could have excluded me, since neither had exhausted all of his peremptory challenges. As for myself, I did not object, trusting that—if the parties wanted me to serve—I could perform the task fairly and impartially.

. . . .

I tried as best I could to blend in with my colleagues . . . requesting that the court attendant not refer to me as senator and reminding other jurors that each of us had an equal role in deciding the outcome of the case.

. . . .

[I]n this case, all six jurors had found the plaintiff highly credible and, conversely, had determined that the defendant had misrepresented the facts after having failed to exercise reasonable care.

. . . .

I became acutely aware that jurors are not generally permitted to ask questions during trial (except through written request)[.]

. . . .

Additionally, jurors are usually prohibited from taking notes[.]

. . . .

[J]urors might easily conclude that they receive second-rate treatment—despite platitudes extolling their invaluable contributions. In our case, for instance, we were informed that the trial would be extended an extra day to accommodate a physician scheduled to testify for the defense. Yet neither the judge nor lawyers bothered to inquire whether that accommodation would conflict with jurors' schedules, thus ultimately forcing one (unemployed) juror to cancel a job interview and another to rearrange long-standing travel plans.

Other seemingly small matters proved irritating. Jurors were cautioned that they could not drink water during the trial because it would be "distracting".... Moreover, during the morning and afternoon "coffee" breaks, jurors were sequestered in the back room without any amenities—including coffee. And needless to say, jurors were keenly aware that the five-dollar per diem compensation that they would eventually receive would barely cover the cost of lunch, let alone the cost of gas for travel to and from the courthouse.

Yet, paradoxically, when it ultimately came time to render a verdict, our jury was then bestowed with immense power and responsibility. In preparation of our deliberation, the judge gave us detailed instructions, which in this case lasted about an hour. These instructions amounted to a mini-course in tort law, similar in content to what some law students have trouble absorbing over the course of a full semester. Although the judge read from carefully prepared notes, we again were prevented from taking our own notes (but reminded that we must closely follow all of the instructions).

. . . .

In determining the monetary award, the jury relied on a version of the time-unit method for calculating damages. Still our "formula" was hardly scientific. And it is worth noting that some jurors had initially suggested amounts that differed by well over a million dollars. Yet one thing seemed clear: none of us would have voluntarily traded the plaintiff's neck surgery (with the insertion of a steel plate) and indisputable life-long pain for any substantial financial amount.

Nevertheless, we also did not want to be perceived as a "run-away" jury. So we concluded that it would not be appropriate to award a seven-figure amount in damages. Whether our ultimate determination of $876,000 was "fair," of course, is certainly debatable (and the defense attorney later indicated that it would be appealed).

*Over the course of our deliberation I became increasingly aware that other jurors were relying on me for assistance, especially in dealing with abstract legal concepts and procedural issues. For example, I was asked to clarify what the judge meant by "proximate cause" and its significance in proving a negligence claim. I do think my familiarity with the law proved helpful to fellow jurors;* but I remain undecided as to whether it's advisable to have a lawyer serve on a jury—especially as its foreman. *I am convinced that in our case my opinions swayed other jurors and were extremely influential in the final outcome.*
[Emphasis added.]

After we remanded the matter for a hearing, Martin and the other five jurors testified with respect to their experiences during

the trial. The trial court questioned each of the jurors individually and then gave each counsel the opportunity to question each juror.

Martin testified as juror number one. He noted that during the trial, the jurors knew he was a lawyer and "they would ask me from time to time some procedural questions, you know, like why are we in here and what's going on, and, you know, if it was—and I would occasionally, you know, if I thought I knew, I would tell them. But if I didn't, I—you know, I would say, I don't know."

When questioned about statements in the article, Martin said that "[t]he primary area where ... they relied on me for assistance ... from my perspective was on the nature of damages." He "suggested the time unit rule, and then assigned a period of time, taking into consideration the pre-existing injuries and the length of the plaintiff's expected life, and whether we should set a figure on a daily basis, as opposed to some other form of calculation."

With respect to proximate cause, Martin testified:

We were going through [the] instructions, and I believe the words "proximate cause" were actually the language, and a couple—at least one juror wanted to have a little more clarification as to what "proximate cause" was. And so we—you know, we talked about that. They seemed satisfied with the discussions.

. . . .

[F]rom my perspective on this, again, ... I am pretty familiar with the general principles of tort law, and I heard [the judge] give [his] instructions to us, and I could easily remember the instructions that [he] gave us. And if there was a question or two, I could sort of regurgitate it better than most because I was very familiar with the kind of language and the terminology and the way in which it's applied in doing a personal injury case.

Martin further explained that "what I was trying to say in the article was somebody raised a question, and we talked about it, and we went—went over again [the court's] explanation of what proximate cause was as best we could recall it. And I think I could recall it very well. And the other jurors were then satisfied. I did not, you know, present my own legal theory on what I think tort law should be."

Notwithstanding his comment in the Law Journal that he "was asked to clarify ... 'proximate cause' and its significance in proving a negligence claim," Martin stated:

> At no time did I present my own definition. As I mentioned to [the trial court], there was a juror who wanted a fuller explanation with respect—or he didn't—didn't quite—he said something to the effect, you know, like what is—what is this proximate cause, something like that. And we discussed it. And the person was satisfied.

Martin acknowledged that he never suggested that the jurors direct their questions to the court, "[a]nd as jury foreman, I didn't see any point in time when we had to direct any questions to the [c]ourt."

With respect to his comment in the article that his opinions "swayed other jurors and were extremely influential in the final outcome," Martin stated, "Well, in terms of the final—the final outcome, it was—it wasn't in the decision as to whether there was comparative negligence, and it wasn't—it wasn't dealing with the issue of negligence on the part of the defendant. It was based upon damages.... I think that my views may have been more accepted as we talked about those exhibits."

Although Martin testified that he tries "to be precise and accurate" in his writings, he later agreed that in this case he was "not as precise and accurate as I—in hindsight as I should have been if I had realized the kind of scrutiny that this was going to be given in this form of proceeding."

Clarifying his statement in the article that he was "convinced that in our case my opinions swayed other jurors and were extremely influential in the final outcome," Martin testified that he thought he "had strong input that was highly respected by my fellow jurors with respect to discussing the facts with the exhibits and the testimony that was given in the case, and, also, in deciding what was a fair amount of damages, if any damages should have been awarded." He further acknowledged that he "had reasonably strong opinions about the videotape that was presented. I had reasonably strong positions about the testimony of the store manager, the general store manager who appeared on the scene,

and his comments .... and I think that my reasoning was fairly persuasive in terms of the other jurors." When asked how he knew he had such "extreme influence over these other jurors," Martin responded, "I don't know that. It was my subjective opinion that when I gave my opinions about the facts and the testimony and the exhibits that others came to agree with many, or a lot of my opinions.... [O]verall, I thought that I was fairly influential with respect to discussing the exhibits, and also with— which led to the finding of facts, and then with respect to setting a fair measure of damages." Martin further stated that he thought "a couple of [the jurors] were somewhat impressed that I was a state senator."

The other jurors were then questioned with respect to Martin's participation in the deliberations. All of the jurors were aware that Martin was a law professor and a state senator from the voir dire. Juror number two testified that some of the jurors asked Martin questions. She could not, however, remember what the questions were other than ones concerning the calculation of damages. Juror number two did not remember much of the jury instructions either.

Juror number three also remembered little of the instructions or deliberations. With respect to the other jurors asking Martin questions, juror number three testified, "[P]eople were talking. I know people were asking him questions, I was asking other people, people were asking each other questions. So I don't recall the specifics of the questions that were asked of each other."

Juror number four did not remember anybody asking anything. She did not believe that Martin played any special role beyond being one of the jurors. In fact, she testified that "he hardly spoke." It was her recollection, however, that the four-day trial "lasted like a week and a half, maybe."

Juror number five stated that some of the other jurors asked Martin for assistance because of his "[k]nowledge of laws and such." She testified, however, that she understood the legal concepts and was not swayed by his opinions. She acknowledged

that the jurors looked to Martin on the amount of damages and testified that it was Martin who set the amount of damages. In the end, juror number five testified that she did *not* feel she rendered an impartial and unbiased decision.

Juror number seven [2] testified that she thought all of the jurors looked to Martin "for guidance." She further stated that she did not know what "proximate cause" meant. Otherwise, juror number seven had little recollection as to any of the specifics of the jury instructions or the deliberative process.

After the hearing, the trial court rendered a written decision in which it noted that despite Martin's disclosure during voir dire that he was an attorney, law professor and state senator, neither counsel sought to have him excused from the jury. The court found that "the jurors did not accord Senator Martin with any 'special role' during deliberations other than his [c]ourt appointed role as foreman." It further noted that the jurors "agreed they rendered a true verdict based on the evidence and in the process were in compliance with their sworn duty as jurors." The court concluded that "there was no evidence of any misconduct either during the trial or at the time of deliberations."

The court disregarded juror number five's "answer that she did not feel she rendered an impartial and unbiased verdict," stating that there were no follow-up questions to the answer and noting that the juror had stated in voir dire "that she could be a fair and impartial juror." The court also downplayed Martin's misstatement of the jury charge in his article, where he wrote that the jury was "told that if the defendant was found to be negligent, we must then arrive at a fair, just and reasonable award of monetary damages." The court noted that the jury was not so instructed. Further, with respect to Martin's comment that he explained "abstract legal concepts" to the jurors, such as proximate cause,

---

[2] Seven jurors were originally selected to hear the case, but juror number six was excused after the jury was sworn, leaving the minimum number of six jurors to deliberate and reach a verdict.

the court found that because the verdict sheet contained a separate question "dealing with proximate cause which the jury had to answer before they could consider damages," the "misstatement in the article had no bearing on the verdict."

The court found that in the Law Journal article Martin "overstated his impact on the other jurors," based upon the jurors' testimony that they "did not accord Senator Martin with any 'special role' during deliberations." While Martin was helpful in calculating damages, "he did nothing improper in the process." The court concluded that "[w]hile the article should not have been published when it was, nevertheless, this was Senator Martin's error in judgment."

## IV

We will first address defendant's argument that plaintiff's counsel's "antics" during the trial and the court's lack of response thereto denied defendant a fair trial. We have detailed the more significant "antics" of plaintiff's counsel in Part II above. Defendant argues that based upon plaintiff's counsel's conduct, the trial court erred in denying its motion for a mistrial after plaintiff's opening statement and its post-judgment motion for JNOV or a new trial.

In addressing a motion for a mistrial, the judge is ordinarily in the best position "to gauge the effect of a prejudicial comment on the jury in the overall setting." *State v. Winter*, 96 *N.J.* 640, 647, 477 *A*.2d 323 (1984). Generally, we defer to the trial court's decision on a mistrial motion unless there is a clear abuse of discretion. *State v. L.P.*, 352 *N.J.Super.* 369, 379, 800 *A*.2d 207 (App.Div.), *certif. denied*, 174 *N.J.* 546, 810 *A*.2d 65 (2002).

When considering a motion for JNOV or a new trial, "[t]he trial judge shall grant the motion if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." *R.* 4:49–1(a). The

factfinder's determination is "entitled to very considerable respect [and] .... should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination[.]" *Baxter v. Fairmont Food Co.*, 74 *N.J.* 588, 597, 379 *A.*2d 225 (1977). The trial judge must " 'canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict.' " *Dolson v. Anastasia*, 55 *N.J.* 2, 6, 258 *A.*2d 706 (1969) (quoting *Kulbacki v. Sobchinsky*, 38 *N.J.* 435, 445, 185 *A.*2d 835 (1962)). The purpose of JNOV is "to correct clear error or mistake by the jury," and not for the judge to "substitute his [or her] judgment for that of the jury merely because he [or she] would have reached the opposite conclusion[.]" *Ibid.* The same standard governs our review of the trial court's determination of a motion for JNOV or a new trial. *Id.* at 7, 258 *A.*2d 706.

We have carefully reviewed the record in this matter and we are satisfied that the trial court did not err in denying defendant's motion for a mistrial after plaintiff's opening statement. The court gave a curative instruction that was sufficient to overcome any prejudice that may have arisen from plaintiff's counsel's improper comments in his opening statement. It is plaintiff's counsel's continued inappropriate conduct, which was not sufficiently addressed by the trial court, that leads us to conclude that defendant did not receive a fair trial and that the jury verdict was tainted by cumulative error.

"[E]ven when an individual error or series of errors does not rise to reversible error, when considered in combination, their cumulative effect can cast sufficient doubt on a verdict to require reversal." *State v. Jenewicz*, 193 *N.J.* 440, 473, 940 *A.*2d 269 (2008). When "legal errors are manifest that might individually not be of such magnitude to require reversal but which, considered in their aggregate, have caused [a party] to receive less than a fair trial," a new trial is warranted. *Eden v. Conrail*, 175 *N.J.Super.*

263, 267, 418 A.2d 278 (App.Div.1980), *modified by* 87 *N.J.* 467, 435 A.2d 556 (1981).

"[W]here an attorney persists in making unwarranted prejudicial appeals to a jury which taint the verdict . . . . we have often held that a reversal is in order." *Hofstrom v. Share,* 295 *N.J.Super.* 186, 193, 684 A.2d 981 (App.Div.1996), *certif. denied,* 148 *N.J.* 462, 690 A.2d 610 (1997). Here, our review of the record has convinced us that plaintiff's counsel persisted "in making unwarranted prejudicial appeals to [the] jury" and that the trial court did not adequately respond to defendant's objections to cause plaintiff's counsel to change his trial strategy. As we have noted above, the court in some instances minimized the prejudice that accrued to defendant from plaintiff's counsel's conduct. For example, the court allowed plaintiff's counsel to question Tyndall on the baby splash cologne without any foundation and without even establishing that the product was carried by the store at the time of the accident. Similarly, the court allowed plaintiff's counsel to question Tyndall on the Wakefern document without any foundation. In neither instance did the court instruct the jury to disregard the questions and draw no inferences therefrom.

The court allowed plaintiff's counsel to imply repeatedly that defendant failed to maintain and/or produce spill inspection records, without establishing whether industry standards required maintenance of such records, whether specific records were requested or whether there had been any pre-trial motions to compel discovery of such records.

We need not consider whether each error standing alone would warrant reversal because we are satisfied that in the aggregate, the numerous errors recited in Part II of this opinion deprived defendant of a fair trial. *State v. Orecchio,* 16 *N.J.* 125, 134, 106 A.2d 541 (1954).

## V

We next address defendant's argument that Martin's article in the Law Journal disclosed that he improperly influenced

the jurors and that there was an apparent misunderstanding of the jury charges.

> The fundamental right of trial by a fair and impartial jury is jealously guarded by the courts. A jury is an integral part of the court for the administration of justice and on elementary principles its verdict must be obedient to the court's charge, based solely on legal evidence produced before it and entirely free from the taint of extraneous considerations and influences. A jury can act only as a unit and its verdict is the result of the united action of all the jurors who participated therein. Therefore, the parties to the action are entitled to have each of the jurors who hears the case, impartial, unprejudiced and free from improper influences.
>
> [*Panko v. Flintkote Co.,* 7 *N.J.* 55, 61, 80 *A.*2d 302 (1951).]

When there are allegations of jury misconduct, "the trial judge must make a probing inquiry into the possible prejudice caused by any jury irregularity, relying on his or her own objective evaluation of the potential for prejudice rather than on the jurors' subjective evaluation of their own impartiality." *State v. Scherzer,* 301 *N.J.Super.* 363, 487–88, 694 *A.*2d 196 (App.Div.), *certif. denied,* 151 *N.J.* 466, 700 *A.*2d 878 (1997) (citing *State v. Weiler,* 211 *N.J.Super.* 602, 609–12, 512 *A.*2d 531 (App.Div.), *certif. denied,* 107 *N.J.* 37, 526 *A.*2d 130 (1986)).

> It is well settled that the test for determining whether a new trial will be granted because of the misconduct of jurors or the intrusion of irregular influences is whether such matters could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge. *If the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so.* The stringency of this rule is grounded upon the necessity of keeping the administration of justice pure and free from all suspicion of corrupting practices.
>
> [*Panko, supra,* 7 *N.J.* at 61–62, 80 *A.*2d 302 (emphasis added).]

In *State v. Nelson,* 318 *N.J.Super.* 242, 723 *A.*2d 627 (App.Div.), *certif. denied,* 158 *N.J.* 687, 731 *A.*2d 47 (1999), an attorney was empaneled as a juror. After the State rested, a juror advised the court that "she had heard the attorney speculating in the jury room about events that had occurred in court and that she did not want to listen to him." *Id.* at 255, 723 *A.*2d 627. After interviewing the attorney, "who indicated that the jurors had been asking questions of him 'regularly'" and that he explained to the jurors

"the legal distinctions between robbery and theft," the judge dismissed the attorney from the jury. *Ibid.* The remaining jurors were then questioned about the attorney's remarks. "All of the jurors assured the judge that they could forget the attorney's comments and decide the case on the evidence and in accordance with the judge's instructions on the law." *Ibid. Nelson* differs from the present case in that Martin's comments to the jurors were not disclosed until after the verdict, thereby depriving the court of the opportunity to question the jurors until a year after the trial.

Although in his testimony Martin claimed he overstated his influence on the jurors in the Law Journal article, we cannot so easily accept his assertion. He testified that he wrote the article shortly after the jury verdict, but did not approach the Law Journal regarding publication until some months later. The remand hearing occurred a full year after the trial, leaving many of the jurors unable to recall the court's instructions, the deliberations or whether they had specific interactions with Martin. All of the jurors were aware of Martin's positions as lawyer, law professor and state senator, and several commented that he was particularly influential in the discussion of damages, having proposed the amount of damages ultimately awarded by the jury. Moreover, Martin testified that it was he who suggested and explained the time unit method for calculating damages.

We find the court's conclusion that there was no evidence of jury misconduct contrary to the record as a whole. Most of the jurors had little recollection of the deliberations and at least one juror, juror number five, stated that she did *not* feel that the case was decided fairly and impartially. While the court commented that counsel did not follow up on juror number five's answer, the court itself should have followed up on her response to inquire why she felt the verdict was unfair, but it did not do so.

As the Supreme Court established in *Panko,* the question is whether "irregular influences" on the jury "could have a *tendency* to influence the jury in arriving at its verdict in a manner

inconsistent with the legal proofs and the court's charge." 7 *N.J.* at 61, 80 *A.*2d 302 (emphasis added). Thus, "tendency" to influence the verdict—not probability or likelihood—is the standard for determining whether a new trial should be granted.

If any juror did not understand or remember the definition of a legal term or concept, they were instructed to send a note to the judge. Martin testified, however, that he saw no reason to do so because *he* explained the judge's instructions to the jurors, contrary to the court's instruction.

 Martin was designated foreperson of the jury by virtue of being juror number one—not by his positions as state senator, law professor or lawyer. As foreperson, his role was to maintain order in the deliberations, marshal the jurors' votes on the issues presented on the verdict sheet and to render the verdict on behalf of the jurors. *See, e.g., State v. Jenkins,* 182 *N.J.* 112, 119, 861 *A.*2d 827 (2004); *Mahoney v. Podolnick,* 168 *N.J.* 202, 210–11, 773 *A.*2d 1102 (2001); *State v. Rodriguez,* 254 *N.J.Super.* 339, 347–48, 603 *A.*2d 536 (App.Div.1992). Otherwise, the jury foreperson is only one vote of six and his opinions have no greater weight than those of the other jurors. It is *not* the role of the foreperson to explain legal concepts to the other jurors.

In short, our review of the entire record in this case convinces us that Martin's explanations to the jury had a "tendency" to influence the verdict. That "tendency," coupled with the cumulative trial errors, deprived defendant of a fair trial. Accordingly, we are constrained to reverse the order of August 4, 2006 and remand the matter for a new trial. We need not address defendant's remaining arguments.

Reversed and remanded.