**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5469-16T1

STORM COLLETON and
MELINDA COLLETON,

      Plaintiffs-Appellants,

v.

MARK BIEBEL, DPM, MARK
DECOTIIS, DPM, BIEBEL &
DECOTIIS PODIATRY ASSOCIATES,
SHREWSBURY SURGICAL CENTER,
THEODORE KUTZIN, MD, and
ATLANTIC AMBULATORY
ANESTHESIA ASSOCIATES, LLC,

      Defendants-Respondents.

_____

Argued April 29, 2019 – Decided May 15, 2019

Before Judges Fasciale and Gooden Brown.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-5125-12.

Michael B. Zerres argued the cause for appellants (Blume Forte Fried Zerres, & Molinari, attorneys; Michael B. Zerres, of counsel and on the briefs; Robert C. Sanfilippo, on the briefs).

Charles C. Koernig argued the cause for respondents Mark Biebel, Mark DeCotiis, and Biebel & DeCotiis Podiatry Associates (Kaufman Borgeest & Ryan, LLP, attorneys; Charles C. Koernig, of counsel; Jonathan D. Hallett, on the brief).

James M. Ronan, Jr. argued the cause for respondents Theodore Kutzin and Atlantic Ambulatory Anesthesia Associates (Ronan, Tuzzio & Giannone, PA, attorneys; James M. Ronan, Jr., of counsel and on the brief; Nicole M. Scillia, on the brief).

Judith A. Wahrenberger argued the cause for respondent Shrewsbury Surgical Center (Ruprecht Hart Ricciardulli & Sherman, LLP, attorneys; Judith A. Wahrenberger, of counsel; Lindsay B. Beaumont, on the brief).

PER CURIAM

This is a medical malpractice case primarily against two podiatrists (Dr. Mark Biebel, DPM; and Dr. Mark DeCotiis, DPM), an anesthesiologist (Dr. Theodore Kutzin), and a nurse (Janice Jones) (collectively defendants).[1] Plaintiff Storm Colleton suffered permanent nerve damage following surgery to repair a torn Achilles tendon. The case came down to a battle of the experts on the standard of care applicable to the correct amount of tourniquet pressure

---

[1] Plaintiff, and his wife Melinda Storm, who filed a per quod claim, (collectively plaintiffs), had also sued Biebel and DeCotiis Podiatry Associates; Shrewsbury Surgical Center as respondeat superior for nurse Janice Jones; and Atlantic Ambulatory Anesthesia Associates (the other defendants).

applied to plaintiff's right thigh.  Dr. Biebel, who performed the surgery, used 350mm/Hg of mercury as tourniquet pressure, which plaintiff contended was too great.

The jury found that plaintiffs failed to prove defendants deviated from the accepted medical standards of care.  After the judge denied plaintiffs' motion for a new trial, she entered a judgment of no cause of action.  Plaintiffs argue primarily that the judge made erroneous evidentiary rulings and failed to address juror misconduct.  We agree, reverse the judgment, and remand for a new trial on all issues.

## I.

Plaintiff was an avid martial arts participant.  While fighting in a Kapap[2] match, he kicked an opponent and felt a pop in his right leg.  The next day plaintiff consulted Dr. Biebel, who ordered an ultrasound and MRI of plaintiff's right leg.  Those tests revealed that plaintiff severely ruptured his Achilles tendon.  Dr. Biebel told plaintiff that corrective surgery was the best option, it was a simple procedure, and he would be back to work as a State Trooper in four to six weeks.

---

[2]  Kapap is an Israeli self-defense form focusing on hand-to-hand combat and physical endurance.  See https://en.wikipedia.org/wiki/Kapap.

Plaintiff underwent the surgery at the Shrewsbury Surgery Center on March 30, 2011. Dr. DeCotiis, who was Dr. Biebel's partner, assisted during the surgery. Plaintiff returned home with a "pain pump" attached to the back of his right leg. The pump intravenously fed pain medication into his leg through a catheter that Dr. Kutzin had inserted into the soft tissue behind the knee, an area known as the popliteal fossa. After a couple of days, the medicine was exhausted and plaintiff removed the pump and catheter as directed by the discharge instructions. Initially, he felt no pain when he removed the catheter, nor did he notice any bleeding or swelling, but shortly after removing the pump, plaintiff felt intense pain in his leg. Plaintiff took Percocet, which did not relieve the pain.

Dr. Biebel then met plaintiff at the emergency room, where he received morphine. The doctor was unsure what was causing the pain, but noted swelling in the upper part of plaintiff's right foot. There was no sign of swelling or bleeding in the leg itself. He instructed plaintiff to come to his office if the pain did not subside.

Thereafter, plaintiff followed up with Dr. Biebel, who was still unsure of the source of the pain, so he sent plaintiff to a pain management doctor who prescribed several pain control medications, none of which worked. Dr. Biebel

4

referred plaintiff to a physiatrist for nerve conduction studies, which showed Dr. Biebel that plaintiff had no nerve function from his right knee downward.

Plaintiff then sought second opinions from numerous medical specialists. He underwent physical therapy and consulted with an orthopedic surgeon, both to no avail. A neurologist performed a second nerve conduction study, which again revealed significant nerve damage in plaintiff's right leg. During this period, plaintiff's right foot and leg pain persisted. He experienced "electric shocks" that awakened him in the middle of the night, and he suffered from substantial muscle atrophy.

In March 2012, plaintiff consulted Dr. Lee Dellon, a peripheral nerve surgeon from Maryland. Dellon performed two separate surgical procedures that restored some feeling to plaintiff's leg and foot but did not alleviate the toe contractures. The surgery resulted in pain abatement, but sporadic electric shocks continued.

In January 2014, Dr. Martin O'Malley, who is a foot and ankle specialist, surgically removed the tendons in plaintiff's toes, which helped plaintiff walk. Dr. O'Malley inserted metal screws to straighten plaintiff's toes, and plaintiff's right foot had increased from a size nine to an eleven doublewide, which required special shoes.

A-5469-16T1

Plaintiff's theory at trial was that his nerve injuries were caused by compression from over-pressurization of the mid-thigh pneumatic tourniquet used during the Achilles repair surgery. He blamed Dr. Biebel for setting the tourniquet pressure too high. As to Dr. DeCotiis, Dr. Kutzin, and the nurse, his theory was that they failed to intercede and insist that Dr. Biebel lower the pressure.

Plaintiff presented expert testimony from Dr. Arup De, an anesthesiologist. He noted that plaintiff's tourniquet was in place for forty-eight minutes at a pressure of 350mm/Hg of mercury. Dr. De concluded that Dr. Kutzin deviated from the accepted standard of care by not questioning the use of such a high tourniquet pressure.

Plaintiff also presented expert testimony from Erica Leach, a licensed registered nurse. Ms. Leach identified guidelines for perioperative practice published in 2007 by the Association of periOperative Registered Nurses (AORN).[3] The guidelines cautioned to use a minimum amount of pressure for pneumatic tourniquets. She stated that Jones departed from accepted standards

---

[3] AORN is a professional association for perioperative nurses that publishes guidelines to "define standardized practice for perioperative professionals." https://www.aorn.org/about-aorn (last visited Apr. 29, 2019).

A-5469-16T1

of nursing care by failing to advocate for her patient, and that Jones should have been aware of the AORN guidelines and spoken to Dr. Biebel about the over-pressurization.

Plaintiff subpoenaed Dr. Marshall Allegra, an orthopedic surgeon and treating physician, to testify as a fact witness. He treated plaintiff from October 2011 through May 2012. During his first visit, plaintiff complained of pain, stiffness, numbness, and a limp in his right lower extremity. Allegra performed a physical examination and noted marked atrophy of the muscles in plaintiff's right leg; numbness and paresthesia from the calf to just above the knee; numbness and paresthesia in the foot; a hammer-toe deformity of the great toe; and decreased sensation on the underside of the foot. Dr. Allegra recommended physical therapy, an electromyography (EMG),[4] and orthosis for his shoes. In his notes from the first exam, he wrote that plaintiff had undergone a successful Achilles tendon repair surgery, but was suffering neurological damage "possibly from a tourniquet use." When plaintiff returned to see Dr. Allegra in October 2011, he brought the new EMG reports and complained of increasing pain in his right heel. Dr. Allegra noted "evidence of peripheral nerve damage, probably

---

[4]  A nerve conduction study is the part of an EMG that looks at peripheral nervous system health.

A-5469-16T1

secondary to a tourniquet," and gave plaintiff an analgesic painkiller to desensitize his foot.

Dr. Allegra examined plaintiff in January 2012, and observed atrophy of the right leg and clawing of the lesser toes of the right foot. In February 2012, Dr. Allegra noted increased sensitivity on the sole of the right foot, persistent atrophy, and clawing of the toes. An EMG study showed sciatic neuropathy. Dr. Allegra concluded that "[t]here ha[d] been some progression since August 2011, but nothing that was significant," and that any further improvement was not likely. When plaintiff saw Dr. Allegra for the last time in May 2012, he had undergone decompressive surgery with Dr. Dellon.

Plaintiff produced testimony from Dr. Christopher Winfree, his treating neurosurgeon. Dr. Winfree examined plaintiff and concluded that plaintiff "most likely had a circumferential compression" of the nerves that had been subjected to pressure around the leg. He believed that the most likely cause of the injury was the tourniquet: "there's really nothing else in the medical record that would have, to my knowledge, caused the circumferential pressure injury of those nerves." With regard to the contractures of plaintiff's toes, Dr. Winfree believed they resulted from the compression injuries, particularly to the tibial nerve.

Plaintiff also produced testimony from his clinical neurophysiologist, Dr. Paul Kostoulakos, who verified plaintiff had evidence of neuropathy of the tibial and peroneal nerves and innervation in multiple muscles. He concluded that "there was continued tibial and peroneal nerve dysfunction as well as acute and chronic denervation changes appreciated in multiple muscles more distally in the lower extremity on the right." Dr. Kostoulakos believed that plaintiff's problems were the result of a compressive injury related to the Achilles repair surgery, and that it "could be surgically related phenomenon due to placement or for tourniquet time."

Plaintiff presented expert testimony from Dr. David Plotkin, a podiatric physician, who had performed many Achilles tendon repairs. Dr. Plotkin explained that most Achilles injuries are partial tears, but plaintiff's was much more extensive because the tendon was almost completely severed. As to the appropriate tourniquet pressure, Dr. Plotkin believed a reasonable tourniquet compression for plaintiff would have been approximately 250 mm/Hg. In Dr. Plotkin's opinion, Dr. Biebel deviated from the accepted standard of care by setting the tourniquet pressure unnecessarily high. He believed that Dr. DeCotiis deviated from the accepted standard of care by failing to question Dr. Biebel's decision to set the tourniquet pressure at 350 mm/Hg.

9

After the verdict, plaintiff and his counsel were conferring in the courthouse parking lot when four jurors approached them and told plaintiff they were sorry. One of the jurors then went up to plaintiff, grabbed him by the arms, and said that her son and his son were friends. Plaintiff's counsel wrote to the judge the next day describing the incident. The judge found counsel's filings to be deficient and saw no prejudice to plaintiff from the juror's personal revelation.

## II.

We begin by addressing plaintiffs' argument that the judge abused her discretion by precluding Dr. Plotkin from testifying about facts that he reviewed and relied upon in rendering his expert opinion, specifically facts contained in Dr. O'Malley's operative report. Although it was important to Dr. Plotkin's testimony, and even though it was undisputed, the judge precluded Dr. Plotkin from mentioning the amount of tourniquet pressure of 250 mm/Hg that Dr. O'Malley had used.

The tourniquet pressure used during the January 2014 surgery was relevant because it established a basis for Dr. Plotkin's opinion that 250 mm/Hg was the appropriate tourniquet pressure. It showed that it was possible to achieve hemostasis on plaintiff's right leg at a pressure of 250 mm/Hg. Although

A-5469-16T1

that fact, in and of itself, is not determinative of the standard of care, Dr. Plotkin reviewed and relied on Dr. O'Malley's operative report when giving his own expert opinions about whether tourniquet pressures other than 350 mm/Hg may have been effective.

We review a trial judge's evidentiary rulings for abuse of discretion. Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008). "[T]he latitude initially afforded to the trial [judge] in making a decision on the admissibility of evidence – one that is entrusted to the exercise of sound discretion – requires that appellate review, in equal measures, generously sustain that decision, provided it is supported by credible evidence in the record." Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 384 (2010).

Dr. O'Malley did not testify during the trial. The information contained in his operative report – specifically the amount of tourniquet pressure – would therefore be hearsay. "Hearsay consists of three classic elements: (1) a 'statement;' (2) 'other than one made by the declarant while testifying at the [present] trial or hearing;' and (3) offered in evidence for its truth, i.e., 'to prove the truth of the matter asserted' in the statement." James v. Ruiz, 440 N.J. Super. 45, 59 (App. Div. 2015) (alteration in original) (citing N.J.R.E. 801(c)). Hearsay

is inadmissible unless the statement falls within one of several recognized exceptions.

Here, reference in the operative report to the tourniquet pressure falls under a recognized hearsay exception, and a separate evidence rule pertaining to facts or data that a testifying expert has reasonably relied on in rendering expert opinions. The applicable hearsay exception is N.J.R.E. 803(c)(6), which states:

> A statement contained in a writing or other record of acts, events, conditions, and, subject to [N.J.R.E.] 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make it, unless the sources of information or the method, purpose or circumstances of preparation indicate that it is not trustworthy.

The operative report falls under this exception. N.J.R.E. 803(c)(6) specifically references N.J.R.E. 808, which states:

> Expert opinion which is included in an admissible hearsay statement shall be excluded if the declarant has not been produced as a witness unless the trial judge finds that the circumstances involved in rendering the opinion, including the motive, duty, and interest of the declarant, whether litigation was contemplated by the declarant, the complexity of the subject matter, and the likelihood of accuracy of the opinion, tend to establish its trustworthiness.

A-5469-16T1

In applying this rule, "case law in our State has traditionally admitted 'routine' findings of experts contained in medical records that satisfy the business record exception, but has excluded 'diagnoses of complex medical conditions' within those records." James, 440 N.J. Super. at 63 (quoting State v. Matulewicz, 101 N.J. 27, 32 n.1 (1985)). The amount of tourniquet pressure used is neither a diagnosis nor a complex medical condition. The parties recognize that it is an undisputed fact.

The judge precluded the testimony, in part, because doing so would deprive defendants' counsel from cross examining Dr. O'Malley. Of course, under N.J.R.E. 808, "medical opinions in hospital records should not be admitted under the business records exception where the opponent will be deprived of an opportunity to cross-examine the declarant on a critical issue such as the basis for the diagnosis or cause of the condition in question." Nowacki v. Cmty. Med. Ctr., 279 N.J. Super. 276, 282-83 (App. Div. 1995). "If the requirements of [N.J.R.E.] 808 are met, and a testifying expert has reasonably relied upon the non-testifying expert's opinions, then the testifying expert may be permitted to refer to that absent expert's opinions in the course of explaining his or her own opinions in court." James, 440 N.J. Super. at 64. But Dr. Plotkin relied on facts in the report, not opinions.

A-5469-16T1

Our evidence rules, under certain circumstances, allow experts to rely on hearsay.  N.J.R.E. 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Thus, under this rule, "a testifying expert may refer to 'facts or data' provided by another source, even though expressed through a hearsay statement."  James, 440 N.J. Super. at 65.  The testifying expert may rely on a non-testifying expert's examination so long as the information is of a type reasonably relied on by experts in the field.  Ibid.  The operative report – and its reference to the amount of tourniquet pressure Dr. O'Malley used on plaintiff – is of a type that experts in the field rely, as Dr. Plotkin explained.

The judge precluded other witnesses from testifying about whether plaintiff had ever had a tourniquet pressure of 250 mm/Hg.  For example, on cross-examination, plaintiffs' counsel asked Dr. Biebel if he knew whether plaintiff had ever had a tourniquet pressure of 250 mm/Hg.  And plaintiffs' counsel questioned Dr. Biebel's podiatric expert (Dr. Michael Downey) about whether such pressure had ever been successfully used on plaintiff.  Plaintiffs'

counsel attempted to establish that doctors were able to achieve a right thigh hemostasis at a pressure of 250 mm/Hg. In fact, Dr. Downey noted the tourniquet pressure applied by Dr. O'Malley, and Dr. Downey had testified about the subject at his deposition. But the judge sustained objections by defendants' counsel to these questions.

In sustaining the objections, the judge explained – relying on N.J.R.E. 403 – that the probative value of the testimony was outweighed by its prejudicial affect. But to be excluded under this rule, the "probative value [must be] substantially outweighed by the risk of . . . undue prejudice[.]" Here, plaintiff's tourniquet pressure for the 2014 surgery was highly probative to Dr. Plotkin's opinion on the standard of care. And it showed that lower pressure would have been successful. We conclude that the probative value was not substantially outweighed by any prejudicial affect.

III.

Plaintiffs maintain that the judge abused her discretion by allowing Dr. Allegra to render expert opinion testimony on the applicable standard of care. Plaintiffs argue that Dr. Allegra – as a treating physician – could testify about his diagnosis and treatment of plaintiff, but that specifically referring to the

appropriateness of the tourniquet pressure defendants used during the surgery was improper.

On cross-examination, Dr. Allegra said that he regularly used mid-thigh tourniquets as part of his practice, and that he was familiar with appropriate duration and pressure settings for their use. At this point, plaintiff's counsel objected, arguing that the line of questioning was outside the scope of direct examination and that Dr. Allegra had testified as a fact witness, not an expert. The judge overruled the objection.[5]

Dr. Allegra, who was friends with Drs. Biebel and DeCotiis, testified that 350 mm/Hg was a generally accepted pressure setting for a mid-thigh tourniquet. He stated that – hypothetically – if the tourniquet used in plaintiff's surgery had been applied for forty-eight minutes at a setting of 350 mm/Hg, he would reconsider his opinion that the tourniquet was the cause of plaintiff's injury. When asked if he would reconsider his conclusion that the tourniquet was the "probable" cause of plaintiff's injury, he responded:

> In my career, I've done over 10,000 surgical patients or procedures. And very frequently I've used pressures of 350, even higher on some patients over 400 sometimes. And on one hand [plaintiff] clearly shows involvement of nerves and muscles below where a

---

[5] Plaintiff's counsel renewed his objection repeatedly throughout Dr. Allegra's cross-examination, and all objections were overruled.

A-5469-16T1

tourniquet was applied.  However, on the other hand[,] I have never had a case like this in my practice, and I'm unaware of any other physicians who had such an incident.

So saying that it's possibly or probably the tourniquet, it may well be true.  But I think this is a very unfortunate thing if it is.  Because I would have dozens of patients like this in my practice.

Dr. Allegra elaborated:

[T]he 350 [mm/Hg] for less than one hour, to have this type of injury, would be really unusual, I've never seen it.  However, I can't explain why he would have the type of distribution of symptoms he has without it.  So that would make me believe that there could be some underlying problem, such as a low grade chronic compartment syndrome, or some condition which would predispose him for a myolysis, a destruction of muscle, because I've used this pressure many, many times, I know lots [of] people use it, I've never seen anything like this.  So it's unfortunate that it happened to him, but I just, on the one hand, yes, it would match the distribution, on the other hand, I just don't see that as an extreme pressure for an extreme amount of time. So, I'm at a loss for this.

Dr. Allegra reiterated that 350 mm/Hg was an appropriate pressure setting for a mid-thigh tourniquet.

In Stigliano v. Connaught Laboratories, Inc., 140 N.J. 305, 314 (1995), the Court held that a treating physician testifying as a fact witness is permitted

17

to testify about the cause of the patient's disease or injury, because causation is an essential part of diagnosis and treatment.

> Although the treating doctors are doubtless "experts," in this case they are more accurately fact witnesses. Their testimony relates to their diagnosis and treatment of the . . . plaintiff. In this context, moreover, the characterization of the treating doctors' testimony as "fact" or "opinion" creates an artificial distinction. A determination of causation partakes of both fact and opinion. The critical point is that the treating doctors to treat their patients must determine the cause of a disease, whether that determination is characterized as fact or opinion.
>
> As fact witnesses, the treating doctors may testify about their diagnosis and treatment of [the plaintiff's] disorder, including their determination of that disorder's cause. Their testimony about the likely and unlikely causes of [the plaintiff's] . . . disorder is factual information, albeit in the form of opinion.
>
> [Ibid.]

Significantly, the Court distinguished – as do we – the facts before it from those in Piller v. Kovarsky, 194 N.J. Super. 392 (Law Div. 1984), and Serrano v. Levitsky, 215 N.J. Super. 454 (Law Div. 1986), where the defendant-doctors had sought to ask treating physicians not about their treatment of the plaintiffs, but about the defendants' alleged malpractice. Stigliano, 140 N.J. at 314-15. Dr. Allegra's testimony went to the standard of care.

18

Dr. Allegra's testimony concerning plaintiff's complaints, physical examination, and EMG tests were appropriate, as was the fact that Dr. Allegra diagnosed plaintiff as possibly suffering from a tourniquet injury. The question posed on cross-examination concerning whether Dr. Allegra was aware of the tourniquet's duration and pressure setting was also appropriate as it related to the basis of Allegra's diagnosis. Once Dr. Allegra stated, however, that he was not aware of the actual tourniquet setting and did not consider that in his diagnosis, questioning on the topic should have stopped.

Asking Dr. Allegra whether 350 mm/Hg is an accepted tourniquet pressure went beyond any information he used in diagnosing and treating plaintiff. Likewise, asking him if his diagnosis would have changed if he knew the pressure used was 350 mm/Hg relied on facts not provided to him by plaintiff and not considered by him in reaching his diagnosis. Most egregiously, Dr. Allegra's testimony that he had done over 10,000 surgical procedures and frequently used pressures of 350 mm/Hg without seeing the type of injury suffered by plaintiff, relied on his experience as a medical expert and directly related to defendants' alleged malpractice. Moreover, his speculation that plaintiff may have some underlying problem, such as a low grade chronic compartment syndrome, that may have predisposed him to myolysis was an

19

expert opinion based on nothing other than defense counsel's representation of the tourniquet setting during plaintiff's surgery.

Given the importance of the tourniquet pressure issue, the error in allowing Dr. Allegra to offer expert testimony was not harmless. See Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 581 (2016) (analyzing the judge's mishandling of treating physician's testimony under harmless error standard). As observed in Stigliano, "the treating doctors may be the only medical witnesses who have not been retained in anticipation of trial. A jury could find the treating doctors' testimony to be more impartial and credible than that of the retained experts." 140 N.J. at 317.

Defendants' counsel emphasized the importance of Dr. Allegra's testimony. For example, counsel remarked that plaintiff's own witness testified no one has ever seen an injury from 350 mm/Hg; Dr. Allegra has used 350 mm/Hg in 10,000 cases; and Dr. Allegra, says 350 mm/Hg is the number. Given Dr. Allegra's status as a treating physician and the significance placed on his testimony, there is a reasonable likelihood that the improper testimony contributed to the verdict against plaintiff and thus denied him a fair trial. State v. Macon, 57 N.J. 325, 337-38 (1971); Persley v. N.J. Transit Bus Operations, 357 N.J. Super. 1, 9 (App. Div. 2003).

20

IV.

Finally, plaintiffs argue the judge mishandled their allegation of juror misconduct. In the parking lot after the jury returned its verdict, juror number two approached plaintiff, grabbed him by the arms, and stated that her son was friends with plaintiffs' son. Four jurors approached plaintiff and apologized. Plaintiffs contend that the judge failed to, at a minimum, question juror number two about what she had said to see whether the relationships impacted her ability to be fair and impartial, and whether it affected deliberations.

Parties to an action "are entitled to have each of the jurors who hears the case, impartial, unprejudiced and free from improper influences." Panko v. Flintkote Co., 7 N.J. 55, 61 (1951). Indeed, the "right to be tried before an impartial jury is one of the most basic guarantees of a fair trial." State v. Loftin, 191 N.J. 172, 187 (2007). "That constitutional privilege includes the right to have the jury decide the case based solely on the evidence presented at trial, free from the taint of outside influences and extraneous matters." State v. R.D., 169 N.J. 551, 557 (2001).

> It is well settled that the test for determining whether a new trial will be granted because of the misconduct of jurors or the intrusion of irregular influences is whether such matters could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the

21

A-5469-16T1

[judge]'s charge. If the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so. The stringency of this rule is grounded upon the necessity of keeping the administration of justice pure and free from all suspicion of corrupting practices.

[Panko, 7 N.J. at 61-62.]

Where a new trial is sought because of the misconduct of a juror, "the motion should be determined with a view, not so much to attainment of exact justice in the particular case, as to the ultimate effect of the decision upon the administration of justice in general." Id. at 62-63 (internal quotation marks and citations omitted).

"When there are allegations of jury misconduct, 'the trial judge must make a probing inquiry into the possible prejudice caused by any jury irregularity, relying on his or her own objective evaluation of the potential for prejudice rather than on the jurors' subjective evaluation of their own impartiality.'" Barber v. Shop-Rite of Englewood & Assocs., 406 N.J. Super. 32, 54 (App. Div. 2009) (quoting State v. Scherzer, 301 N.J. Super. 363, 487-88 (App. Div. 1997)). "'[T]endency' to influence the verdict – not probability or likelihood – is the standard for determining whether a new trial should be granted." Id. at 56.

> [Courts] have recognized two exceptions to the general rule that jury verdicts shall not be disturbed because of what may have been said by jurors during their deliberations. First, where a juror informs (or misinforms) his colleagues in the jury room of facts about the case, based on his personal knowledge, which facts were not introduced into evidence at the trial, the resultant verdict may be set aside. And, where a juror by his comments in the jury room manifests racial or religious bigotry against a defendant, we have upheld the trial [judge']s action in granting a new trial.
>
> [State v. Athorn, 46 N.J. 247, 251-52 (1966) (citations omitted).]

Here, juror number two's revelation concerning her son's friendship with plaintiffs' son is disconcerting. Several critical questions remained unanswered. It is unknown whether the juror discussed the substance of the case with her son, whether she learned any information about plaintiffs that was not presented as evidence at trial, whether she discussed any such information with other jurors, and whether her son's relationship with plaintiffs' son influenced her deliberations.

Plaintiffs argue that the judge should have at least questioned juror number two. Due process does not require a new trial every time a juror has been exposed to outside influence. R.D., 169 N.J. at 559. Determining whether a jury has been tainted requires the trial judge to consider the gravity of the information, the demeanor of the juror, and the overall impact of the matter on

23

the fairness of the trial. Ibid. The abuse of discretion standard of review applies when reviewing such a determination by the trial judge. Ibid.

In R.D., the Court held that where a juror was exposed to mid-trial publicity, the judge was "obliged to interrogate the juror, in the presence of counsel, to determine if there is a taint; if so, the inquiry must expand to determine whether any other jurors have been tainted thereby." Id. at 558.

A juror's awareness of outside information gives rise to a presumption of prejudice, Scherzer, 301 N.J. Super. at 486-87, and the judge has an obligation to determine if the information had the capacity to influence the verdict, State v. Grant, 254 N.J. Super. 571, 584 (App. Div. 1992). If it had such a capacity, the judge is required to question the jurors individually "in order to determine precisely what was learned, and establish whether they are capable of fulfilling their duty to judge the facts in an impartial and unbiased manner[.]" State v. Bey, 112 N.J. 45, 87 (1988).

Here, the verdict had already been reached. Questioning juror number two had no potential to disrupt jury deliberations. The fact that the juror had a personal connection to plaintiffs, yet chose not to alert the judge to the situation, was disruptive of the orderly administration of justice and potentially prejudicial to plaintiffs. The fact that their sons were friends does not automatically mean

A-5469-16T1

that juror number two was sympathetic to plaintiffs. Indeed, it is possible to imagine any number of petty rivalries or jealousies that would engender the opposite result. The only way to verify exactly what happened was through a post-verdict interrogation. The judge abused her discretion by failing to conduct such an interrogation.

To the extent we have not addressed any remaining argument raised by plaintiffs, we conclude that they are without sufficient merit to warrant attention in this opinion. R. 2:11-3(e)(1)(E).

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION