**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2082-22

DANIEL COHEN,

     Plaintiff-Appellant,

v.

WEG & MYERS, PC,

     Defendant-Respondent.

_____

Argued November 13, 2024 – Decided August 6, 2025

Before Judges Gooden Brown and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-1054-18.

Jeffrey Lubin argued the cause for appellant.

John L. Slimm argued the cause for respondent (Marshall Dennehey, PC, attorneys; John L. Slimm, on the brief).

PER CURIAM

In this dispute over unpaid legal bills, plaintiff Daniel Cohen appeals from a final judgment entered on February 7, 2023, memorializing a jury verdict in favor of defendant, Weg & Myers, P.C., his former attorneys. In essence, the verdict rejected plaintiff's unsupported contentions that the time defendant spent on the case was unreasonable and that defendant's failure to bill on time was inexcusable under the parties' retainer agreement.

On appeal, plaintiff contends that the trial judge should have recused herself and that she made a series of evidentiary and courtroom-management errors that were detrimental to him. For the first time on appeal, plaintiff argues that defendant's expert should have been precluded from testifying because he was not disclosed in discovery, that defense counsel's summation was unduly prejudicial, and that the judge admonishing plaintiff for his inappropriate behavior poisoned the jury against him.

We reject plaintiff's contentions and affirm. Applying our deferential standard of review, we discern no abuse of discretion in the judge's rulings or efforts to control the courtroom. The judge displayed patience and objectivity in the face of plaintiff's persistent disregard of courtroom decorum, continuous interruptions of the trial, and pernicious and combative conduct throughout the proceedings. Further, although defense counsel exceeded the broad latitude

A-2082-22

afforded him in closing argument, plaintiff has not shown that he was sufficiently prejudiced by the remarks to meet the plain error standard.

I.

We glean these facts from the record. On July 27, 2015, Sollecito Custom Homes, LLC (Sollecito) sued plaintiff in Monmouth County in a lawsuit captioned, "Sollecito Custom Homes, LLC v. Daniel Cohen" (the Sollecito matter). The complaint alleged that around April 2014, plaintiff had contracted with Sollecito to build a "luxury custom vacation home" at a cost of several million dollars but had not yet fully paid his obligation. Plaintiff and his family moved into the partially completed home in mid-2015, at which point, despite an outstanding balance of around $187,000,[1] plaintiff told Sollecito that he would make no further payments and would instead complete construction of the home himself.

On October 16, 2015, plaintiff filed an answer to the complaint, accompanied by counterclaims against Sollecito. By June 12, 2017, plaintiff had filed four amended answers, initiating third-party complaints against more than twenty subcontractors, suppliers, tradespeople, and professionals, as well as his own insurance carrier. During that time, plaintiff was represented by a

---

[1] We round all monetary amounts to the nearest dollar.

A-2082-22

sequence of four law firms: Pryor Cashman LLP; Ansell, Grimm & Aaron, PC; Becker & Poliakoff, LLP; and Stark & Stark, P.C.

Plaintiff then sought out defendant, a New York firm specializing in insurance and property damage litigation. In particular, he solicited Dennis D'Antonio, the firm's managing partner and primary trial attorney. Eventually, defendant agreed to represent plaintiff in the Sollecito matter alongside local counsel Gregg Sodini of Cutolo Barros LLC (Cutolo). The parties memorialized their relationship in a retainer agreement dated September 7, 2017. The retainer agreement set out, among other things, the firm's fee schedules, staffing policy, and billing policies. Plaintiff also paid an initial retainer fee of $50,000.

When plaintiff retained defendant, several discovery deadlines were looming: (1) fact discovery, including fact witness depositions, was to be completed by October 12, 2017; (2) plaintiff's expert reports were due November 13, 2017; and (3) the discovery end date (DED) was set for December 13, 2017. After defendant secured an extension, plaintiff's expert reports were due December 1, 2018, and the DED was reset to March 1, 2018. Additionally, defendant received the file for the Sollecito matter from prior counsel, reportedly containing more than 60,000 pages of documents comprising approximately twenty small banker boxes. According to D'Antonio, the

4

accelerated timeline, large file, and complexity of the case required defendant's attorneys to work quickly and thoroughly and to expend a significant amount of labor hours.

Despite a provision in the retainer agreement stating that it was the firm's "policy to bill [its] clients monthly for legal services and costs," defendant did not send plaintiff a bill until January 24, 2018. When an invoice finally arrived, it reflected 443 aggregate hours billed by six staff members between September 13 and December 31, 2017, for a net due of $163,460 in labor plus $9,409 in disbursements.

On January 31, 2018, plaintiff emailed D'Antonio to express his dissatisfaction with the amount of the bill, calling it "ludicrous and, frankly, insulting." In response, D'Antonio explained why the billed amount was necessary given the state of the litigation. D'Antonio also denied any overbilling, explaining that he had written off a good deal of his own time spent on the case. According to D'Antonio, plaintiff demanded that defendant waive the pending bill and agree to work on a contingency basis, or else he would terminate the representation. D'Antonio declined, both because he was uninterested in a contingency arrangement and because he viewed the attorney-client relationship as irreparably damaged.

The relationship quickly deteriorated further. In a series of early-February 2018 emails to D'Antonio, plaintiff attempted to coax defendant to agree to work on contingency, writing, "I like you. I love you. We should go to London together. You know, you're a great guy. Take it on . . . contingency. Make me happy." D'Antonio again declined and, in a February 8, 2018 email, stated that defendant considered itself terminated and that plaintiff should retain new counsel due to impending discovery deadlines and deposition dates. Eventually, plaintiff terminated his local counsel, Sodini, as well. On February 13, 2018, Arbus, Maybruch & Goode, LLC (Arbus) filed a substitution of counsel, designating itself as plaintiff's new counsel in the Sollecito matter.

Defendant subsequently sent two additional bills for work performed prior to termination. One bill, sent April 4, 2018, encompassed January 2 to 31, 2018, and reflected 164 hours of work, totaling $65,031 due in labor and $2,347 due in disbursements. The final bill, sent April 6, 2018, reflected 3.75 hours of work done on February 1, 2018, amounting to $1,312 due in labor, and $18 due in disbursements for photocopying done on February 20, 2018. The billing resulted in a running total of $244,760, including accrued finance charges.

In early 2018, plaintiff filed a complaint against defendant in Monmouth County, claiming unspecified damages and accusing defendant's attorneys who

6

handled the Sollecito matter of "excessive overbilling," "refus[ing] to perform work on his behalf," and "fail[ing] to properly represent [p]laintiff." Defendant filed an answer, accompanied by a counterclaim for breach of contract, alleging $241,559 in unpaid bills, plus fees, costs, interest, and the like.

During discovery, the parties exchanged expert reports. Plaintiff's expert, Peter A. Ouda, Esq., opined that defendant's bill was excessive and unreasonable. Defendant's experts, David L. Wikstrom, Esq., and Jeffrey Kampf, Esq., reached the opposite conclusion in a joint report.

On April 5, 2021, Judge Linda Grasso Jones granted in part defendant's motion to strike Ouda's opinion. The judge ruled that Ouda could not testify that defendant's "invoices were unreasonable, unnecessary or excessive." In support, the judge found that Ouda's opinion was not based on "recognized standards." In addition, because Ouda did not review necessary documents from the Sollecito matter, the judge determined his opinion lacked a sufficient factual basis. However, the judge ruled that Ouda could testify that the timing of the first invoice violated the retainer agreement, despite it not being "clear that expert testimony [was] necessary on th[e] issue." The judge also concurrently ordered that plaintiff could only present an affirmative case for damages if he had, in fact, "paid more than would have been invoiced at the first monthly

7

invoice date," and was "otherwise limited to presenting a defense to [defendant's] counterclaim."

Prior to trial, Arbus withdrew as plaintiff's counsel.[2] Plaintiff's eventual trial counsel entered the case only weeks before the trial, which occurred over six days between November 29 and December 6, 2022. At trial, plaintiff moved for reconsideration, asking the judge to remove the restrictions on Ouda's testimony. The judge denied the motion.

During the trial, plaintiff failed to comply with proper courtroom decorum. During his trial testimony, plaintiff was instructed multiple times not to argue with the judge, level personal attacks at defense counsel, or talk over the judge or the attorneys, including his own. Plaintiff was particularly intransigent on cross-examination, refusing even to concede that he was the plaintiff in the case. As a result, the judge had to direct plaintiff to answer the question posed or to refrain from providing unnecessary testimony on at least twelve occasions. Plaintiff's conduct was so egregious that, through his own attorney, the judge investigated the possibility that there was a medical issue but was assured that there was none.

---

[2] Arbus withdrew on July 20, 2020.

A-2082-22

Plaintiff also interrupted motion practice and disrupted the testimony of a defense witness with "snickers," "jeers," and "laughs." At one point, while testimony was ongoing, plaintiff engaged in an altercation with sheriff's officers in the hallway, which was audible inside the courtroom. Due to plaintiff's behavior, the jury was temporarily excused three times over the course of the trial.

Substantively, plaintiff testified regarding his dissatisfaction with defendant's representation, including defendant not sending monthly invoices despite "over a dozen" requests, defendant's failure to provide more specific billing descriptions, defendant's attorneys spending too much time reviewing the file compiled by his previous attorneys, defendant's attorneys billing simultaneously during intra-office meetings, and the fact that the case was handled by multiple attorneys instead of D'Antonio personally. Plaintiff's expert, Ouda, supported plaintiff's claim, testifying that attorneys had an ethical obligation to regularly send bills. However, Ouda could not specify the source of the obligation within the confines of his expert report.

Following the close of plaintiff's case-in-chief, defendant moved for involuntary dismissal of plaintiff's claims pursuant to Rule 4:37-2(b). The judge granted the motion in part, barring "plaintiff from . . . proceeding on a claim of

malpractice," but otherwise denied the motion as to the counterclaim, allowing plaintiff to proceed with his defensive argument that "the billing was excessive."

In turn, D'Antonio testified for the defense, contradicting much of plaintiff's testimony. He stated that he had explained to plaintiff that the litigation would be expensive. He told plaintiff that, if hired, defendant would direct litigation strategy and staffing, not plaintiff. In fact, to ensure that plaintiff knew "it was a full team" assigned to his case, D'Antonio introduced plaintiff to the attorneys who would be billing, and plaintiff had subsequently exchanged "dozens of emails" directly with these attorneys. D'Antonio also testified that although plaintiff had tried to discourage defendant from fully reviewing the file received from prior counsel, D'Antonio had insisted and explained why doing so was indispensable for proper representation.

Additionally, D'Antonio testified that the monthly billing policy was "not a guarantee." While he acknowledged the error in failing to timely send the first invoice, he explained that it was an oversight that had only been detected when he asked plaintiff why he had not paid anything on the account. D'Antonio stated that the firm had been in frequent contact with plaintiff to keep him apprised of progress on the case—a claim substantiated with numerous emails— and plaintiff had never commented on the missing bills. D'Antonio added that

A-2082-22

when he offered to review the bill with plaintiff, plaintiff asked no questions and instead demanded that the bill be written off in favor of a contingency agreement. Finally, D'Antonio walked the jury through the voluminous case file, which was moved into evidence in its entirety. D'Antonio detailed the file's contents and explained why it took so much time to review.

Kampf, defendant's expert, supported D'Antonio's trial testimony. Kampf opined that based on his review of the Sollecito matter and in light of the applicable legal standards, defendant's bill was reasonable.[3]

Sodini, the parties' local counsel, also testified consistently with D'Antonio's testimony. Sodini recounted the extensive work that had to be done quickly when defendant inherited the case, as well as plaintiff being informed about the extent of the work "on more than a daily basis." Sodini further stated that when he gave plaintiff his final bill from Cutolo, plaintiff complained that it was too high and refused to pay. Plaintiff then rejected Sodini's offers to reduce the bill or to go to arbitration. Cutolo eventually sued plaintiff for the unpaid legal bill and obtained a consent judgment against him.

Over the course of the trial, evidence was elicited that plaintiff had a practice of "negotiat[ing] every bill" he received, "including [from] law firms,"

---

[3] Wikstrom did not testify at trial.

11

in order to "minimize [his] expenses." Additionally, Arbus, which represented plaintiff in the Sollecito matter after defendant and initially filed suit on plaintiff's behalf in this case, also obtained a judgment against plaintiff for unpaid legal bills (the Arbus litigation).[4]

After the close of evidence, the parties made various motions, all of which were denied. Pertinent to this appeal, plaintiff moved for a mistrial based on the admission of evidence encompassing, among other things, Cutolo's and Arbus's respective actions against plaintiff for unpaid legal fees. Plaintiff separately moved for a mistrial based on the audible altercation between himself and the sheriff's officers earlier in the trial. Additionally, plaintiff argued for the first time that the judge should have recused herself from the trial because she had been "[un]fair to him" and "bias[ed] against him" while presiding over the preceding Arbus litigation. Plaintiff laughed and jeered during argument on the recusal motion to underscore his claim of bias. The jury was not present.

After denying the mistrial applications the following day, as a precaution, the judge examined each juror individually to ensure that no juror was aware of or prejudiced by the verbal altercation between plaintiff and the sheriff's officers

---

[4] We affirmed Arbus's award in Arbus, Maybruch & Goode, LLC v. Cohen, 475 N.J. Super. 509, 519 (App. Div. 2023).

in the hallway. Although most of the jurors confirmed hearing something, no juror was able to identify the speakers or what was said. Critically, each juror asserted that the incident would have no effect on their deliberations.

Following summations and jury instructions, the jury deliberated for less than half an hour before unanimously returning a verdict in defendant's favor. The jury found plaintiff liable for breach of contract and fixed damages at $244,760. Plaintiff moved for judgment notwithstanding the verdict, primarily arguing that the jury could not have properly evaluated the evidence so quickly, evincing bias against him. The judge denied the motion, remarking that the evidence was "quite strong" and that the jury was not obligated to comb through all the evidence presented.

On February 7, 2023, the judge entered a judgment reflecting the jury's verdict in addition to an award of pre-judgment interest in the amount of $182,825, plus post-judgment interest to be calculated under the relevant court rules. This appeal followed.

On appeal, plaintiff raises the following points for our consideration:

[POINT I]

JUDGE GRASSO[ ]JONES SHOULD HAVE RECUSED HERSELF DUE TO BIAS STEMMING

13

FROM AN FBI[5] COMPLAINT MADE BY [PLAINTIFF] AGAINST JUDGE GRASSO[ ]JONES.

[POINT II]

MISTRIAL SHOULD HAVE BEEN GRANTED DUE TO JUD[GE] GRASSO[ ]JONES PRECIPITATING AN ALTERCATION BETWEEN [PLAINTIFF] AND SHERIFF'S OFFICERS WITHIN EARSHOT OF THE JURY.

[POINT III]

JUDGE GRASSO [JONES] PREJUDICED THE JURY BY ALLOWING THEM TO LOOK AT 21 BANKERS BOXES AND PILES OF DOCUMENTS WHICH SHOULD NEVER HAVE BEEN ADMITTED INTO EVIDENCE; THE SHEER VOLUME OF WHICH WAS PREJUDICIAL TO [PLAINTIFF].

[POINT IV]

JUDGE GRASSO[ ]JONES ERRED IN BARRING [PLAINTIFF'S] EXPERT'S TESTIMONY EVEN THOUGH [DEFENDANT'S] EXPERT HAD THE SAME DEFICIENCY.

[POINT V]

[DEFENDANT'S] EXPERT SHOULD HAVE BEEN PRECLUDED FROM TESTIFYING AS NOT DISCLOSED IN DISCOVERY[.] (NOT RAISED BELOW)

---

5  FBI stands for Federal Bureau of Investigation.

A-2082-22

[POINT VI]

MISTRIAL SHOULD HAVE BEEN ORDERED IN LIGHT OF [DEFENDANT'S] HIGHLY PREJUDICIAL SUMMATION. (NOT RAISED BELOW)

[POINT VII]

JUDGE GRASSO[ ]JONES ADMONISHED [PLAINTIFF] IN THE PRESENCE OF THE JURY. (NOT RAISED BELOW)

[POINT VIII]

JUDGE GRASSO[ ]JONES ADMITTED HIGHLY PREJUDICIAL CHARACTER EVIDENCE OVER REPEATED OBJECTIONS.

II.

In several interrelated arguments, plaintiff argues that the judge's bias against him prevented him from receiving a fair trial. In Point I, he contends that she should have recused herself because of her actions while presiding over the Arbus litigation. Specifically, he states that he had reported the judge to the FBI several weeks before this trial for her "continued harassment" and "bias" in connection with a post-judgment collection application in the Arbus litigation. He also claimed that the judge allowed the plaintiff in the collection application to "weaponize the courts" against him, which showed her "corruption." According to plaintiff, the judge retaliated against him because of his FBI

15

complaint by allowing defense counsel to "badger" him on cross-examination, creating "an appearance of impropriety."

In Point II, plaintiff argues that the judge should have granted his motion for a mistrial because she was at fault for "engineer[ing] the circumstances" that led to his verbal altercation with the sheriff's officers in the hallway. He maintains that she was "fully aware of how upset [plaintiff] had been the last time she ordered a sheriff's officer to confront him" in the collection application in the Arbus litigation. In Point VII, he asserts that the judge "contaminated" the jury's perception of him by "admonish[ing]" him that his statements about defense counsel were "inappropriate." He argues that despite the judge's "apparent concern for character attacks," she did not reprimand other witnesses who made "snide and insulting remarks" about him.

A party may move for a judge's recusal or disqualification pursuant to Rule 1:12-2. Such motions are "entrusted to the sound discretion of the judge and are subject to review for abuse of discretion." Amato v. Twp. of Ocean Sch. Dist., 480 N.J. Super. 239, 245 (App. Div. 2024) (quoting Goldfarb v. Solimine, 460 N.J. Super. 22, 30 (App. Div. 2019), aff'd as modified on other grounds, 245 N.J. 326 (2021)). Alternatively, sua sponte recusal is addressed by Rule 3.17(B) of the Code of Judicial Conduct, which instructs that "[j]udges shall

disqualify themselves in proceedings in which their impartiality might . . . reasonably be questioned."  Additionally, Rule 1:12-1 mandates that a judge "shall be disqualified on the court's own motion" in various circumstances.  The only relevant circumstance here is subsection (g):  "when there is any . . . reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so."

 Because "[a] judge must act in a way that 'promotes public confidence in the independence, integrity and impartiality of the judiciary,'" the aforementioned standards cover the "'appearance of impropriety.'"  Goldfarb, 460 N.J. Super. at 30 (quoting Code of Jud. Conduct r. 2.1).  However, a party's subjective belief that the judge is biased is insufficient; any such belief must be "objectively reasonable" in order to merit recusal.  Panitch v. Panitch, 339 N.J. Super. 63, 67 (App. Div. 2001) (quoting State v. Marshall, 148 N.J. 89, 279 (1997)).

 To be sure, "[l]itigants ought not have to face a judge where there is [a] reasonable question of impartiality."  Ibid. (omission in original) (quoting Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 162 (3d Cir. 1993)).  However, "[b]ias cannot be inferred from adverse rulings against a party."  Strahan v. Strahan, 402 N.J. Super. 298, 318 (App. Div. 2008).  The applicable

test, therefore, is whether "a reasonable, fully informed person observing the judge's conduct would have doubts about the judge's impartiality" considering the facts in a given case. Goldfarb, 460 N.J. Super. at 31 (quoting Code of Jud. Conduct, r. 2.1 cmt. 3).

> As we have made clear, however, the touchstone is the objectively reasonable belief, [DeNike v. Cupo, 196 N.J. 502, 517 (2008)], and it remains true that an appearance of impropriety must be "something more than a fanciful possibility" and "must have some reasonable basis[,]" Higgins v. Advisory Comm. on Prof'l Ethics of Supreme Court, 73 N.J. 123, 129 (1977).
>
> [Kane Properties, LLC v. City of Hoboken, 214 N.J. 199, 222 (2013).]

That said, "[i]t is just as damaging to the integrity of the judicial process" when parties manipulate "the system to secure the removal of a judge they dislike." Id. at 32 (citing State v. Dalal, 221 N.J. 601, 607-08 (2015)). In that regard, the weight of federal authority is "against compelling recusal merely by attacking a judge." United States v. Eisenberg, 734 F. Supp. 1137, 1166 (D.N.J. 1990) (collecting authority from the Second, Third, Ninth, and Tenth Circuits); see also Dalal, 221 N.J. at 607-08 (collecting federal authority).

New Jersey courts have reached a similar conclusion. See, e.g., Racetrack Supermarket, LLC v. Mayor & Twp. Council of Cherry Hill, 459 N.J. Super.

197, 214-15 (Law Div. 2018) (remarking that "[t]o consider a party's own animus" or prior "personal[] attack[s]" toward a judge "would have the undesirable effect of handing over to parties and their counsel the ability to disqualify judges based wholly upon whether they have animus toward the judge").

As such, whenever "there is any evidence" that a party has "threat[ened] or [made] efforts to intimidate a judge" to "prompt the recusal of a judge or somehow manipulate the proceedings, recusal is not required." Dalal, 221 N.J. at 606-09 (citing DeNike, 196 N.J. at 517). "To assess a defendant's objective, a judge may consider direct evidence and also draw reasonable inferences from the record." Id. at 608.

In addressing a motion for a mistrial, the trial judge is "ordinarily in the best position 'to gauge the effect'" of an allegedly prejudicial event on the jury "'in the overall setting.'" Barber v. ShopRite of Englewood & Assocs., Inc., 406 N.J. Super. 32, 51 (App. Div. 2009) (quoting State v. Winter, 96 N.J. 640, 647 (1984)). "Generally, we defer to the trial court's decision on a mistrial motion unless there is a clear abuse of discretion." Ibid. "The grant of a mistrial is an extraordinary remedy that should be exercised only to prevent manifest justice." Belmont Condo. Ass'n, Inc. v. Geibel, 432 N.J. Super. 52, 97 (App. Div. 2013).

As such, an outside or irregular influence merits a mistrial where it "could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge." Barber, 406 N.J. Super. at 54 (quoting Panko v. Flintkote Co., 7 N.J. 55, 61 (1951)). While there need not be evidence that the matter "actually influenced the result," ibid. (emphasis omitted) (quoting Panko, 7 N.J. at 61), there must at least be a "rational basis to conclude [that the] incident" could have "tainted the jury's verdict." State v. J.T., 455 N.J. Super. 176, 209 (App. Div. 2018). That said, when such an influence is possible, "the trial judge must make a probing inquiry into the possible prejudice caused by any jury irregularity, relying on his or her own objective evaluation of the potential for prejudice rather than on the jurors' subjective evaluation of their own impartiality." Barber, 406 N.J. Super. at 54 (quoting State v. Scherzer, 301 N.J. Super. 363, 487-88 (App. Div. 1997)).

Applying these principles, we are unpersuaded by plaintiff's claims that either a mistrial or recusal was warranted. We first observe that recusal was not raised and no objection to the judge presiding over the trial was made until the close of evidence. More significantly, plaintiff's subjective belief that the judge was biased against him is unsupported by the record. Plaintiff does not identify any personal background between himself and the judge, any offensive

20

comments, or any other evidence from the Arbus litigation or the present case giving "rise to more than a reasonable belief by an objectively reasonable litigant that the judge could not be fair and impartial." Chandok v. Chandok, 406 N.J. Super. 595, 606 (App. Div. 2009).

Indeed, aside from the fact that the judge did not rule in his favor in a prior matter—decidedly insufficient proof of bias—plaintiff does not identify any credible evidence of prejudicial conduct to support his claim. Strahan, 402 N.J. Super. at 318; see also Div. of Youth & Fam. Servs. v. L.C., 346 N.J. Super. 435, 438-40 (App. Div. 2002) (holding that judge presiding over prior matter involving same defendant did not warrant recusal). Instead, plaintiff's unsubstantiated, eleventh-hour claim of the judge's bias against him suggests that his objective in moving for recusal was motivated by forum shopping or the desire to have another bite at the apple. See State v. McCabe, 201 N.J. 34, 47 (2010) ("The timing of a motion for recusal may also be telling in certain instances"); Dalal, 221 N.J. at 609 ("[A] defendant's outburst in the middle of a trial . . . might reasonably be seen as an attempt to thwart the orderly administration of justice and would not necessarily call for recusal."); Goldfarb, 460 N.J. Super. at 32 ("Judge-shopping — an attorney's attempt to have a

particular judge try his or her case — may undermine public confidence in the impartial administration of justice.").

In Chandok, we held that a judge "erred in refusing to recuse himself because a reasonable person could have concluded that . . . he might be biased" against the defendant's attorney based upon a "prior professional relationship that resulted in litigation." 406 N.J. Super. at 604-05. In the course of "the breakup of the law firm in which the judge and defendant's trial attorney were partners," the judge had filed a formal complaint in which he accused the attorney of acting "deceitfully," "embezzl[ing] funds," and "assault[ing] him." Id. at 597, 604. We acknowledged that "'it [was] not necessary to prove actual prejudice on the part of the court[] to establish an appearance of impropriety,'" and concluded that the "acrimonious relationship" between counsel and the judge "gave rise to more than a reasonable belief by an objectively reasonable litigant that the judge could not be fair and impartial." Id. at 606 (quoting DeNike, 196 N.J. at 517). Here, however, plaintiff's complaints about the judge show his own bias, not the judge's.

Equally unavailing is plaintiff's argument that a mistrial should have been granted in connection with the verbal altercation with the sheriff's officers in the hallway. Preliminarily, we reject out of hand plaintiff's absurd claim that the

22

judge orchestrated the dispute. The argument erupted when plaintiff failed to seek permission to leave the courtroom while testimony was ongoing. When sheriff's officers confronted plaintiff in the hallway about the transgression, a verbal altercation ensued that was audible inside the courtroom. The judge promptly dismissed the jury to avoid prejudice and denied plaintiff's ensuing application for a mistrial because the jury was neither aware of the substance of the altercation nor plaintiff's involvement in it. Out of an abundance of caution, before sending the jury to deliberate, the judge questioned each juror to ensure that there was no possibility of prejudice. Each juror confirmed that they did not know who was involved in the incident and would not allow it to impact their deliberation. We discern no abuse of discretion in the judge's ruling and no rational basis to conclude that the incident could have tainted the jury's verdict.

It is essential to the proper administration of justice that "dignity, order, and decorum be the hallmarks of all court proceedings in our country." Illinois v. Allen, 397 U.S. 337, 343 (1970). "The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated." Ibid. "[T]rial judges confronted with disruptive, contumacious, stubbornly defiant [litigants] must be given sufficient discretion to meet the circumstances

of each case," and "[n]o one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." Ibid. Under the circumstances, we can find no fault with the judge's handling of her courtroom and no basis to intervene.

Turning to plaintiff's claim that he was prejudiced by the judge admonishing him before the jury, plaintiff acknowledges that he has not properly preserved the issue for appeal. Thus, we consider the issue under the plain error standard of review and "will not reverse unless plain error is shown." Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009) (citing R. 2:10-2). To satisfy that standard, a party must demonstrate that (1) there was error and (2) the error was "clearly capable of producing an unjust result." Willner v. Vertical Reality, Inc., 235 N.J. 65, 79 (2018) (quoting R. 2:10-2).

This exacting standard requires reversal only where the possibility of an injustice is "real," or "sufficient to raise a reasonable doubt as to whether [the error] led the jury to a verdict it otherwise might not have reached." Ibid. (alteration in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)). "The 'high standard' used in plain error analysis 'provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a

potential error.'"  State v. Santamaria, 236 N.J. 390, 404 (2019) (quoting State

v. Bueso, 225 N.J. 193, 203 (2016)).

Plaintiff's challenge implicates Rule 611, governing a trial judge's

authority over witness interrogation.  Rule 611(a) provides:

> The court shall exercise reasonable control over the
> mode and order of interrogating witnesses and
> presenting evidence to:
>
> > (1) make those procedures effective for
> > determining the truth;
> >
> > (2) avoid wasting time; and
> >
> > (3) protect witnesses from harassment or
> > undue embarrassment.

"Judges are accorded 'wide discretion in exercising control over their

courtrooms' and trial proceedings."  Martin v. Newark Pub. Schs., 461 N.J.

Super. 330, 340 (App. Div. 2019) (quoting State v. Stewart, 453 N.J. Super. 55,

67 (App. Div. 2018)).  They "perform a necessary 'gatekeeper role' regarding

testimony adduced at any proceeding."  Stewart, 453 N.J. Super. at 67 (quoting

State v. Nesbitt, 185 N.J. 504, 514 (2006)); see In re Accutane Litig., 234 N.J.

340, 385 (2018).

Here, we discern no error, much less plain error, in the judge's

management of the proceedings.  Indeed, any prejudice was caused by plaintiff,

25

not the judge. Plaintiff specifically takes umbrage with two incidents that occurred on the first day of trial. First, early in his direct examination, plaintiff accused defense counsel of having lied during his opening statement. Defense counsel objected, but plaintiff continued his accusations before the judge could move the discussion to sidebar.

After the sidebar concluded, the judge instructed plaintiff in open court as follows:

> Initially, an objection was made and I had indicated that we would be going to sidebar to discuss the objection. And you kept speaking and you repeated yourself . . . . That's inappropriate.
>
> When an objection is made, as I indicated, you need to wait until a determination has been made on the objection. It is not your role to keep talking and not allow the objection to be played out.

After sustaining the objection and striking the testimony, the judge instructed plaintiff that he was not allowed "to call someone . . . a liar in [c]ourt" but he could "indicate . . . that the information provided was not correct." The judge explained to plaintiff that "we don't allow the lawyers to call someone a liar, and we don't allow the witnesses to call . . . one of the lawyers or one of the other witnesses a liar."

26

The second incident began when plaintiff commented on defense counsel objecting during his testimony. Following a sidebar, the judge sustained the objection and instructed the jury to disregard plaintiff's comments on defense counsel. The judge then directed plaintiff to confine his answers to the question asked by his attorney. Ignoring the judge's instructions, plaintiff repeatedly responded that he was "obligated" by his "oath" to correct the "false statement" made by defense counsel.

At that juncture, the judge reiterated:

> [W]hat I'm telling you is as a matter of law, your statements with reference to the attorney who represents the adversary are inappropriate and you should not make them. And I'd like to not revisit this issue.
>
> So if you want to provide testimony that's appropriately responsive to a question that is posed by your lawyer, . . . and part of your response is what your thoughts were when you received and reviewed this bill, you can do so.

As plaintiff continued to protest, the judge repeated that plaintiff could "provide testimony that [was] responsive to the question, but . . . not engag[e] in a discourse about the attorneys who are handling th[e case]."

We are satisfied that the judge's admonitions did not exceed her discretionary authority to manage the trial and the witness interrogation in a

27

manner that facilitated the orderly presentation of competent evidence. Nor did the judge's admonitions result in any unfair prejudice to plaintiff. See State v. Bitzas, 451 N.J. Super. 51, 76 (App. Div. 2017) ("A trial judge is entrusted with the sound discretion to manage the conduct of a trial in a manner that facilitates the orderly presentation of competent evidence," and "[t]he exercise of this authority is circumscribed by the judge's responsibility to act reasonably and within constitutional bounds." (citing Ryslik v. Krass, 279 N.J. Super. 293, 297-98 (App. Div. 1995))).

Plaintiff asserts that given the length of the second interaction, it "should have happened outside the presence of the jury as it could reasonably have been foreseen to poison [the jury's] disposition to[ward him]." Although we have "suggest[ed]" that trial courts should, in the first instance, address a "contentious witness" outside the presence of the jury, we have explicitly declined to impose such a requirement. Id. at 78-79. "As former trial judges, we are keenly aware of the challenge of maintaining order in a courtroom when confronted with a contentious witness." Id. at 78.

Instead, we have suggested that after identifying the problem, "the judge should clearly and concisely explain to the witness that the conduct disrupts the orderly presentation of the evidence to the jury and clashes with the decorum

and solemnity of the proceedings." Id. at 79. Here, the judge attempted to achieve that objective with her anodyne instructions to plaintiff. However, plaintiff continued to disrupt the proceedings in front of the jury, escalated the tone of the interaction by speaking over the judge, rejected her instructions, and insisted that he be allowed to offer his commentary. Plaintiff's counsel did not request that the interaction return to sidebar or that the courtroom be cleared. Plaintiff now argues, in essence, that the judge should have saved him from himself and prevented the jury from hearing the comments he chose to make over the judge's express instruction. He offers no legal support for such a right, and we discern no basis for one.

Plaintiff also claims he was treated differently from defense witnesses offering the same testimony. We disagree. Although plaintiff was instructed not to cast aspersions on defense counsel, he was allowed to level insults at D'Antonio, referring to him on re-direct examination as an "extremely, extremely unscrupulous person." Unlike plaintiff, D'Antonio did not offer any unsolicited comments on plaintiff of his own accord or over objection.

Instead, on cross-examination, D'Antonio mentioned having misjudged plaintiff initially and not having seen his "true colors." Plaintiff's counsel asked, "[W]hat do you view as [plaintiff's], quote, unquote, 'true colors'?" D'Antonio

responded, "You really want me to answer that?" When counsel confirmed that he did, D'Antonio described what he believed to have been plaintiff's intentional pattern of racking up a large legal bill that he would refuse to pay in order to coerce his law firms into more favorable terms. In this context, D'Antonio remarked: "I think [plaintiff] is a con artist" and "a bad guy." Thus, unlike plaintiff's remarks, D'Antonio's comments were solicited and responsive to cross-examination.

III.

We next address plaintiff's evidentiary claims. In Point III, plaintiff argues that he was prejudiced by the judge's decisions to allow (1) the sealed banker boxes and then (2) the "piles and piles of documents" extracted from the boxes once they were unsealed to remain on the defense table "in full view of the jury." Plaintiff contends that, given the "sheer volume" of the documents, some of them were "probably . . . duplicates of transcripts," making it appear that more work was done on the Sollecito matter "than what the actual work might have been." Plaintiff also asserts that the judge erred in admitting the documents into evidence because they "had never been exchanged in discovery" in this case.

A-2082-22

"Evidentiary decisions are reviewed under the abuse of discretion standard . . . ." Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010). Under that deferential standard, we review a trial court's evidentiary ruling only for a "clear error of judgment." Id. at 384 (quoting State v. Koedatich, 112 N.J. 225, 313 (1988)).

Although plaintiff does not cite to any rules, statutes, or case law, his prejudice argument seemingly implicates Rule 403. Trial courts may exclude relevant evidence "if its probative value is substantially outweighed by the risk of" either "[u]ndue prejudice, confusion of issues, or misleading the jury," or "[u]ndue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403. Still, evidence cannot be excluded for the "mere possibility" of prejudice. State v. Outland, 458 N.J. Super. 357, 369 (App. Div. 2019) (quoting State v. Morton, 155 N.J. 383, 453-54 (1998)).

Indeed, "'[e]ven when evidence is "highly damaging" to a [party's] case, "this cannot by itself be a reason to exclude otherwise admissible and probative evidence"'" in a legal process that is adversarial by nature. Ibid. (quoting State v. Brockington, 439 N.J. Super. 311, 333 (App. Div. 2015)); see also Traver v. Packaging Indus. Grp., 242 N.J. Super. 574, 582-83 (Law Div. 1990) (citing State v. Bowens, 219 N.J. Super. 290, 297 (App. Div. 1987)) (noting prejudice

31

caused by damaging evidence "alone is not adequate to exclude evidence" under Rule 403). "[M]uch of the evidence introduced at an adversarial trial is prejudicial to the opposing party, and we 'would ill-serve the cause of truth and justice if we were to exclude relevant and credible evidence only because it might help one side and adversely affect the other.'" Parker v. Poole, 440 N.J. Super. 7, 22 (App. Div. 2015) (quoting Stigliano by Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 317 (1995)).

The question instead is whether the evidence's "'"probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation" of the issues in the case.'" Griffin v. City of E. Orange, 225 N.J. 400, 421 (2016) (alteration in original) (quoting State v. Koskovich, 168 N.J. 448, 486 (2001)). Further, "[t]he party seeking the exclusion of the evidence" under Rule 403 bears the burden of proving that it satisfies one of the criteria. Griffin, 225 N.J. at 420 (collecting cases).

Applying these principles, we discern no clear error in the judge's evidentiary rulings. The judge allowed the banker boxes to remain in the courtroom in "anticipat[ion] that they[ were] going to be marked as an exhibit" and admitted into evidence. She noted that the boxes were going to be opened

so that plaintiff and his counsel could examine the contents. All these events subsequently occurred.

After the boxes had been unsealed, plaintiff complained that he was prejudiced by the documents being in view of the jury. The judge again overruled the objection, noting that the file was highly probative "to show the volume of . . . work that was necessary" for the Sollecito matter and to counter plaintiff's contention that defendant "fraudulently billed without doing work." As plaintiff's case rested in no small part on the claim that the billable hours were unnecessary, the judge found that the documents, which showed the "work that was actually performed," were "extremely important."

When plaintiff objected to the admission of the file, stating that he never "had the opportunity to review" the documents because they had been sealed until trial, the judge overruled the objection, explaining that although plaintiff's counsel had only recently joined the case, he "st[ood] in the shoes of the first attorney, of the second attorney, . . . [a]nd the shoes of [plaintiff],"[6] all of whom had the opportunity to view the documents prior to trial. The judge added that plaintiff had not identified any particular prejudice from the file apart from the fact that it was "a lot of paper."

---

[6] Plaintiff was self-represented in this litigation at least twice.

A-2082-22

We concur with the judge's rulings and reasoning. Because the documents directly countered plaintiff's excessive billing claim, their probative value was not substantially outweighed by any prejudice caused by their volume. Further, despite his assertions about duplicate documents in the file, plaintiff has yet to identify such duplicates. Moreover, plaintiff's contention that the banker boxes were never exchanged in discovery is belied by the record. Defense counsel represented to the judge that the original file was transferred to Arbus upon defendant's discharge, that defendant had retained a copy of the original, and that defense counsel had secured another copy during discovery. D'Antonio testified to the first two steps, transfer of the original file and retention of a copy, and in no way contradicted the notion that his attorney had received an additional copy during discovery.

Plaintiff's related assertion that the documents "could not have possibly been exchanged in discovery in this case" since the boxes were sealed until trial ignores the fact that parties can satisfy discovery mandates by providing digital or physical copies. See Lipsky v. N.J. Ass'n of Health Plans, Inc., 474 N.J. Super. 447, 464 (App. Div. 2023) (citing R. 4:10-2(a)) ("Our Court Rules provide for broad discovery between parties to a litigation, including electronic discovery . . . ."); R. 4:18-1(a) (permitting parties to serve requests on each other

to inspect or copy documents).  We also reject plaintiff's suggestion that litigants must hand over physical documents they plan to use at trial as both impracticable and unsupported by our jurisprudence.

In Point VIII, plaintiff asserts that the judge erred by admitting "improper prejudicial character evidence" over his objection.  Specifically, plaintiff challenges the admission of "testimony and evidence regarding past and outside allegations by others, lawsuits, and judgments against [him]."  In the trial court, as here, plaintiff cited no evidence rule or case law to support his argument but did not object to the judge construing his arguments as objections under Rules 403 and 404.

Rule 404(b)(1) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition." However, "[t]his evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute."  N.J.R.E. 404(b)(2).

The word "acts" as used in Rule 404(b)(1) refers to general "bad conduct" not amounting to a crime, like "torts" or "quasi-criminal and intentional acts of

35

misconduct." Biunno, Weissbard & Zegas, <u>Current N.J. Rules of Evidence</u>, cmt. 7 on N.J.R.E. 404 (2025-2026); <u>see, e.g.</u>, <u>In re Wenderwicz</u>, 195 N.J. Super. 126, 130-31 (App. Div. 1984) (finding that policeman's prior disciplinary record of loitering in the houses of women and making phone calls while on duty could not be used for propensity purposes), <u>abrogated in part on other grounds by</u>, <u>Steinel v. City of Jersey City</u>, 99 N.J. 1 (1985). Because the "'purpose of Rule 404(b) is simply to keep from the jury evidence that [a party] is . . . a bad person,'" any conduct that "may poison the jury against a [party]" can qualify for exclusion. <u>State v. Skinner</u>, 218 N.J. 496, 517 (2014) (quoting <u>State v. Rose</u>, 206 N.J. 141, 180 (2011)); <u>see, e.g.</u>, <u>ibid.</u> (holding that violent and disturbing rap lyrics were subject to a Rule 404(b) analysis because "[n]ot all members of society recognize the artistic or expressive value in graphic writing").

Although on appeal plaintiff alleges five specific instances of error by the judge, he only objected to two of them in the trial court. The first objection was interposed while plaintiff was being cross-examined on the consent judgment he had entered with Cutolo. Initially, the judge found that the evidence was not substantially more prejudicial than probative under Rule 403 because it was relevant to the jury's evaluation of the amount billed. Specifically, the jury could determine from this evidence that plaintiff's refusal to pay the bill did not stem

from the bill being unreasonable but rather reflected plaintiff's demonstrable practice of "negotiating" through non-payment.

The judge explained:

> [Plaintiff's] own deposition testimony evidently was that I negotiate down all my bills, and the jury is very free to determine that the bill is perfectly appropriate, but that basically, he's doing what he does with everyone else, which is he negotiates it down. He was not successful in negotiating it down with [defendant], and therefore, he's not paying it.

As for Rule 404(b), the judge found that, in light of plaintiff's professed negotiation policy,

> [i]t's not [defendant] trying to prove that this is what [plaintiff] does by showing what happened in other cases. He said, this is what I do. It's a good business practice. I get a bill from a lawyer, and I negotiate it down.
>
> So, [defendant] absolutely can use it in this case. . . . [T]he jury may look and say, . . . what a smart guy, he does this. . . . [O]r the jury may look and say, . . . that doesn't sound very nice.
>
> I don't know what the[ jury is] going to do with it. But they are his words. This is what he says he does, and [defendant is] absolutely permitted to move forward with this line of questioning.

Plaintiff raised his second objection after being asked if Arbus sued him for nonpayment of legal fees incurred during the Sollecito matter. Plaintiff

37

responded, "Yes, they did." Plaintiff's counsel objected on "relevance" grounds, but the judge summarily overruled the objection.

We discern no abuse of discretion in these rulings. As to the latter, evidence of Arbus's lawsuit against plaintiff clearly met the low threshold for relevancy as it tended to prove that he refused to pay all legal bills as a negotiation strategy. N.J.R.E. 401; see Biunno et al., cmt. 1 on N.J.R.E. 401, at 152 ("The test for relevance is broad and favors admissibility."); accord Hrymoc v. Ethicon, Inc., 467 N.J. Super. 42, 75 (App. Div. 2021).

Likewise, under a Rule 403 analysis, we discern no error. Earlier on cross-examination, when asked if it was his "practice and policy . . . to negotiate every bill that comes in whether it was a law firm or a vendor," plaintiff responded that he "tr[ies] to minimize [his] expenses" by "negotiat[ing] as much as [he] can," and confirmed that this included bills from law firms. As the judge referenced, he had professed as much in his deposition as well. Plaintiff's admissions about his strategy of initially refusing to pay bills for services as a negotiating tactic rendered the prejudicial impact of his testimony about the

38

Arbus litigation minor at best. The same reasoning applies to evidence of the Cutolo consent judgment.[7]

Plaintiff's related argument that his admissions made presentation of the previous suits and judgments cumulative, and, "by definition more prejudicial than probative," also misses the mark. His answers on cross-examination did not amount to a stipulation, the offer of which can strengthen a proponent's case for the exclusion of potentially inflammatory material. Biunno et al., cmt. 5 on N.J.R.E. 403, at 231; see, e.g., State v. Jenkins, 356 N.J. Super. 413, 431 (App. Div. 2003) (noting that if defendant were to stipulate to content of murder victim's videotaped testimony at prior trial of defendant, there would be no need to show videotape to jury), aff'd on other grounds, 178 N.J. 347 (2004).

The evidence was also probative because it informed the jury's evaluation of, among other things, D'Antonio's testimony that plaintiff had told him that defendant had to either waive its bills and switch to contingency or "chase [him] and take [him] to . . . court to try to get paid . . . in five years." Therefore, the

---

[7] To the extent that his objection rests on the fact that "[a civil judgment] is a legal finding," and that the imprimatur of the court in other cases would induce the jury to follow suit, plaintiff provides no authority to support his proposition. Rather, objections to prior judgments being introduced as evidence for non-impeachment purposes have centered on whether they are inadmissible hearsay. See, e.g., Yelder v. Zuvich, 245 N.J. Super. 331, 334-35 (Law Div. 1990) (citing McCormick on Evidence § 318 (Cleary ed., 3d ed. 1984)).

probative value of the suits and judgments against plaintiff was not substantially outweighed by their prejudicial effect.

Turning to the Rule 404(b) analysis, plaintiff does not advance any argument that the suits and judgments testimony was used for propensity purposes. A stated policy of negotiating bills from law firms is less of a disposition or general propensity and more, if anything, of a "habit or routine practice," proof of which is specifically authorized by Rule 406. See Showalter v. Barilari, Inc., 312 N.J. Super. 494, 512 (App. Div. 1998) (quoting N.J.R.E. 406) (explaining that the difference between disposition and habit is "the required degree of specificity in the described conduct," with the latter involving "a 'regular practice of responding to a particular kind of situation with a specific type of conduct'" (quoting State v. Radziwil, 235 N.J. Super. 557, 564 (App. Div. 1989))). "To constitute a habit under [Rule] 406, the act 'must be a repeated behavioral response to a specific factual stimulus.'" Fazio v. Altice USA, ___ N.J. ___, ___ (2025) (slip op. at 14) (quoting Biunno et al., cmt. 2 on N.J.R.E. 406, at 353). "If sufficiently established, evidence of a habit or routine practice may be utilized to infer that conduct on a specific occasion conformed to such evidence." Id. at ___ (slip op. at 13).

Even if a negotiation policy were a disposition, defendant did not rely on that disposition as proof that plaintiff committed an act. Indeed, the fact that plaintiff performed the act in question—nonpayment of a bill—was not in dispute. Instead, defendant used the evidence for another purpose, as authorized by N.J.R.E. 404(b)(2). Defendant relied on the testimony to refute plaintiff's contention that he declined to pay defendant's bills because they were excessive, undermining plaintiff's credibility and substantive defense to the counterclaim.

Stated differently, defendant used the evidence not to prove that plaintiff acted a certain way, but rather why he did. This closely tracks multiple expressly permitted uses of prior act evidence, including "proof of motive," "intent," and "plan," all of which were material and disputed. Ibid.; see Harris v. Peridot Chem. (N.J.), Inc., 313 N.J. Super. 257, 278, 284 (App. Div. 1998) (citing State v. Cofield, 127 N.J. 328, 338 (1992)) (stating New Jersey's four-part test "in determining the admissibility of other crime or civil wrong evidence" and noting the "danger of undue prejudice in admitting evidence of other civil wrongs against a defendant in a civil case is arguably less acute" than doing so in a criminal case); e.g., id. at 280-86 (finding evidence of defendant's prior and subsequent releases of hazardous gas admissible under Rule 404(b)(2)); N.J. Div. of Youth & Fam. Servs. v. H.B., 375 N.J. Super. 148, 154,

41

176, 180-81 (App. Div. 2005) (finding stepfather's prior convictions potentially admissible to prove his intent, plan, or preparation to assault his stepdaughter in abuse and neglect complaint against her mother).

The remaining alleged errors urged by plaintiff concern testimony or references by defense counsel in his opening and closing statements to the lawsuits by Arbus and Cutolo and the resulting judgments. Because plaintiff failed to object, we again review for "plain error." R. 2:10-2. For the reasons previously stated, we are satisfied that these alleged errors do not meet the exacting plain error standard.

## IV.

In a series of overlapping arguments contained in Points IV and V, plaintiff contends that the judge erred in excluding his expert's testimony as a net opinion, while permitting defendant's expert to testify despite him having the "same deficiency" and "not [being] disclosed in discovery."

We begin by noting that the scope of appeal on these issues is limited by plaintiff failing to identify the relevant April 5, 2021 order in his Notice of Appeal or Civil Case Information Statement, and failing to supply the transcript of the April 1, 2021 hearing where oral argument on the motion was conducted. See 1266 Apartment Corp. v. New Horizon Deli, Inc., 368 N.J. Super. 456, 459

42

(App. Div. 2004) (limiting consideration to sole judgment identified in notice of appeal); Sikes v. Twp. of Rockaway, 269 N.J. Super. 463, 465-66 (App. Div.) aff'd o.b., 138 N.J. 41 (1994) (explaining that failure to provide a transcript supports limiting the scope of appeal). In addition to these procedural deficiencies, we find the substance of plaintiff's arguments lacking as well.

Rule 703 governs the permissible bases for expert opinions. Expert opinions must be "grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts.'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). "The net opinion rule is a 'corollary of [Rule 703,] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (omission in original) (quoting Polzo, 196 N.J. at 583).

As a result, experts are required to ""give the why and wherefore" that supports the opinion, "rather than a mere conclusion."'" Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)). They must "be able to identify the factual bases for their conclusions, explain

their methodology, and demonstrate that both the factual bases and the methodology are reliable." Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). More specifically, when an expert purports to testify that some action violates professional standards, "there must be some evidential support offered . . . establishing the existence of the standard" that is not "personal to the expert." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011) (quoting Taylor v. DeLosso, 319 N.J. Super. 174, 180 (App. Div. 1999)).

Here, Ouda, plaintiff's expert, submitted a four-page report summarizing his analysis. He reported reviewing the pleadings in this case, answers to interrogatories, the retainer agreement, legal bills, correspondence (presumably between plaintiff and defendant), pleadings in a since-dismissed related fee action filed in New York, and unspecified depositions. He cited assorted caselaw and rules for the general principles that "a lawyer's fee shall be reasonable," "[a]n attorney is required to maintain the highest professional and ethical standards," an attorney's contract with a client must be ethical, and a court should review fee actions to ensure that these standards are maintained.

Then, referencing his "training, skill and education," Ouda concluded that "unreasonable, unnecessary and excessive work" had been done "for the short

44

duration of time that [defendant] was involved in the case." He specified that approximately 92 and 161 hours, respectively, was a "substantial amount of time spent reviewing the file and documents." He opined that these billing items were "very suspicious" because they did not "describe what was done or why it was done," a criticism he levelled at the billing generally.

He stated that "[r]eviewing the file or the documents in a vacuum is per se unreasonable." He also asserted that there were several instances of "double and even triple billing," by which he appeared to refer to multiple attorneys billing for intra-office conferences that they each attended. Finally, he characterized "discovery demands" in general as "routine," asserted that a firm of defendant's size "probably has forms that it works off of," and concluded that defendant's attorneys should not have taken so much time.

In ruling on the pretrial motion to strike, the judge addressed deficiencies in the factual basis of Ouda's opinion, noting that Ouda was not particularly specific about which documents he reviewed. The judge observed that "Ouda did not look at the discovery requests" or "responses prepared by [defendant] or the documents received or propounded by [defendant]," instead limiting his review primarily to the retainer agreement and the bills. The judge found that without viewing either the input (i.e., the trial file, incoming discovery requests

and responsive documents) or output (i.e., outgoing discovery requests and responsive documents), Ouda's opinion lacked the necessary factual support and violated the net opinion rule.

We concur with the judge's ruling and reasoning. As the judge noted, the failure to review the discovery requests, discovery responses, or documents received or propounded by defendant fatally undercut Ouda's opinion that "[t]here is no way that a competent law firm should take [the amount of time billed] to prepare or answer discovery served upon them." In contrast, defendant's experts reviewed the pleadings, defendant's and plaintiff's responses to interrogatories, Ouda's report, defendant's invoices, and various bills from prior counsel, as well as the depositions of plaintiff, D'Antonio, and another partner at defendant's firm. Defendant's expert noted that the "specific and detailed" billing records supported the "[breadth] of the work done," including file review and generation of documentation.

Even if there was an insufficient factual basis for the defense experts' opinions, there is no indication in the record that plaintiff moved to strike their report or Kampf's testimony. Thus, we review for plain error plaintiff's contention that the defense experts' opinion and resulting testimony were likewise inadmissible and discern no basis to intervene.

A-2082-22

Plaintiff's contentions also overlook the fact that the judge found an independent ground to partially strike Ouda's testimony—deficiencies in Ouda's reference to and application of legal and professional standards. The judge noted that Ouda cited RPC 1.5 but "did not discuss the factors set forth" therein, nor explain how they might apply to this case. Similarly, he invoked generally applicable caselaw, but did "not provide any standard supporting [his] opinion that the invoices . . . [were] unreasonable or violated" those standards. Additionally, the judge found Ouda's reliance on his personal experience in fee arbitration inapposite, particularly since he provided no authority to support certain claims such as his repudiation of multiple attorneys billing for a conference they all attended. As such, we discern no misapplication of law in the judge's ruling and no abuse of discretion in the judge's decision to exclude a portion of Ouda's opinion.

Plaintiff argues for the first time on appeal that since defendant represented that Wikstrom would be testifying at trial instead of Kampf, the judge should not have let Kampf testify.[8] However, because the issue was never presented in the trial court, is not "jurisdictional in nature," and does not

---

[8] Plaintiff's counsel asked if Kampf was "on the witness list" several questions into his testimony. The judge and defense counsel replied that he was. Plaintiff concedes on appeal that this exchange did not amount to raising the issue below.

"substantially implicate public interest," it will "not be considered on appeal." Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 2:6-2 (2025); see Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510, 539 (App. Div. 2009) (declining to hear a discovery issue not presented to the trial court).

V.

In Point VI, plaintiff argues for the first time on appeal that, in summation, defense counsel unfairly commented on the fact that Ouda did not opine that defendant's bills were excessive despite knowing that Ouda would have done so but for defendant's successful motion to strike. Relying on Bender v. Adelson, 187 N.J. 411, 431 (2006), plaintiff argues that these remarks were impermissible and "extremely prejudicial" and that a "[m]istrial should have been [o]rdered." While we agree that defense counsel's remarks were improper, the error does not warrant reversal under the plain error standard of review. See R. 2:10-2.

It is axiomatic that "counsel is allowed broad latitude in summation." Hayes v. Delamotte, 231 N.J. 373, 387 (2018) (alteration in original) (quoting Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999)). However, "[t]hat latitude is not without its limits, and 'counsel's comments must be confined to the facts shown or reasonably suggested by the evidence introduced

during the course of the trial.'" Ibid. (quoting Colucci, 326 N.J. Super. at 177). As such, "[c]ounsel cannot 'misstate the evidence [or] distort the factual picture.'" Comprehensive Neurosurgical, P.C. v. Valley Hosp., 257 N.J. 33, 84 (2024) (second alteration in original) (quoting Bender, 187 N.J. at 431). "That includes commenting on the lack of evidence after successfully excluding such evidence, despite knowing it exists." Ibid.; see, e.g., Bender, 187 N.J. at 433 (holding that counsel improperly asked the jury, "Where are the outside independent experts in cardiology?" after successfully moving to exclude two cardiologists). Such "comments impermissibly 'exploit[] a favorable evidentiary ruling . . . to strike an unfair blow." Id. at 85 (omission in original) (quoting State v. Garcia, 245 N.J. 412, 434 (2021)).

Generally, a trial court's rulings regarding summation are reviewed for abuse of discretion. Litton Indus., Inc. v. IMO Indus., Inc., 200 N.J. 372, 392-93 (2009). However, when opposing counsel fails to register a timely objection, it deprives the court of the opportunity to take timely curative action and suggests that counsel did not view the remarks as prejudicial. Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 523 (2011). We thus review such belated claims for plain error. Ibid. (citing R. 2:10-2). In so doing, comments are viewed in the context of the record, Almog v. Israel Travel

Advisory Serv., Inc., 298 N.J. Super. 145, 161 (App. Div. 1997), and "fleeting and isolated" comments, even if improper, are unlikely to constitute reversible error on their own, State v. Watson, 224 N.J. Super. 354, 362 (App. Div. 1988).

Here, despite the judge precluding Ouda from testifying about whether the fees were excessive, defense counsel argued as follows in summation:

> He didn't say the bills were excessive. He didn't say that the bills were not necessary. He didn't offer that opinion. So he's not on the same wave[length] as . . . [plaintiff], who said well they're unreasonable, I was outraged when I got them. Well get it together guys. You need to have an expert who's going to support your testimony . . . and he didn't. You remember Ouda. He didn't say one time that the bills were excessive, unreasonable[, or] not fair, not one time.

Later, after discussing the defense expert's testimony regarding the reasonableness of the fees, defense counsel added that there was, "[n]o testimony from the other side that the rates [were not] reasonable."

Plaintiff's counsel did not object to the comments. However, by using a fortuitous evidentiary ruling to affirmatively distort the evidence, counsel transgressed the "broad latitude" afforded him in summations. Hayes, 231 N.J. at 387 (quoting Colucci, 326 N.J. Super. at 177). Still, our inquiry does not end there. The error is only reversible if it was "clearly capable of producing an unjust result." Willner, 235 N.J. at 79 (quoting R. 2:10-2). This standard is

particularly difficult to meet in civil cases, where it is "discretionary and 'should be sparingly employed.'" Baker v. Nat'l State Bank, 161 N.J. 220, 226 (1999) (quoting Ford v. Reichert, 23 N.J. 429, 435 (1957)).  With summation issues in particular, "[w]e presume that when a lawyer observes an adversary's summation, and concludes that the gist of the evidence has been unfairly characterized, an objection will be advanced." Fertile by Fertile v. St. Michael's Med. Ctr., 169 N.J. 481, 495 (2001), abrogated on other grounds by, Cuevas v. Wentworth Grp., 226 N.J. 480 (2016).

In the absence of an objection, we are convinced that the error withstands plain error scrutiny.  Because Ouda did not testify that the bills were excessive and had arrived at his conclusion based on sweeping generalities, the prejudicial effect of the remarks was relatively weak.  Critically, as the judge noted, the evidence against plaintiff was exceedingly strong, a conclusion strongly supported by the jury requiring less than thirty minutes to deliberate and reach a unanimous verdict.  We therefore conclude that defense counsel's comments in summation did not amount to plain error.

To the extent we have not specifically addressed any of plaintiff's remaining arguments, we deem them without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M. C. Harley*

Clerk of the Appellate Division

A-2082-22